Paul Daniel LANDRY, Plaintiff-Appellant Cross Appellee,

v.

OFFSHORE LOGISTICS, INC., et al., Defendants-Appellees Cross Appellants.

ODOM OFFSHORE SURVEY, INC., Defendant Third Party Plaintiff-Appellee Cross Appellant,

v.

BOLLINGER AND BOYD, INC., Third Party Defendant.

No. 75–1450.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1977.

---

**2.** *Supra* at p. 755.

Darryl J. Tschirn, Gothard J. Reck, Metairie, La., for plaintiff-appellant.

James E. Blazek, Sam A. LeBlanc, III, New Orleans, La., for Odom Offshore.

James H. Roussel, Winston Edward Rice, New Orleans, La., for Offshore General.

Before COLEMAN, CLARK and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge:

This case has been tried twice in the District Court. At the first trial, plaintiff recovered a judgment for $350,000. At the second, plaintiff recovered judgment for $238,998. Both sides are unhappy. The plaintiff appeals the grant of a new trial, which set aside his $350,000 verdict. The defendant cross appeals, attacking the second recovery. We affirm altogether.

The plaintiff, Paul Landry, 43 years old in 1972, quite deaf, a marine engineer, was a seaman and a member of the crew on a work boat, the P.G.T. BEAUREGARD. According to his testimony, on November 10, 1972, the captain ordered him to crank the engines, that the boat had to move. The seas were at 8–10 feet and Landry told the captain that it was too rough to move. On the captain's orders, he untied from the stationary platform, went down to the engine room and returned to the starboard bow of the vessel. While Landry was trying to attach a line from the BEAUREGARD to the stand-by boat, the captain reversed the engines. Landry was thrown from the railing, to which he had been holding, and into the uncoiling rope, which hung his foot, injuring his right leg at or near the ankle. His shoe came off and the rope slipped from his foot. He declined transfer to a service boat on account of the high seas. Three days later, the BEAUREGARD docked. Landry's foot was hurting so intensely that he went to a doctor. He remained ten days in the Abraham Kaplan Hospital and soon afterwards went back for a skin graft to his right ankle. He claimed that if he walks or "stayed too much on it" the ankle swells, that he cannot walk straight on his foot because he had pain underneath it, and "cannot walk straight on my ankle", has "to walk kind of sideways". He said that two years after the accident the ankle was still giving him a lot of trouble. Landry had not worked since the accident, said he was unable to walk or

stand for any length of time, and had not sought work.

At the time of the second trial he was seeing Doctor Trahan once a month, the only doctor who had treated him.

Plaintiff's hospital records were introduced into evidence, with no objection. The diagnosis upon admission was:

*Working diagnosis: After physical examination—*

Avulsion of the skin over the median and lateral malleolar, multiple severe ligamental tears ankle joint, cellulitis foot, ankle, and lower leg.

EXTREMITIES: The right foot and ankle is (sic) extremely swollen and red. There are patch avulsion and brush burns of approximately 4 x 6 cm. areas of skin over the medial and lateral malleoli. The ankle is diffusely swollen with ecchymotic discoloration. There is obvious edema and erythema of the lower leg, ankle and foot.

The diagnosis at discharge was:

Patient was admitted with trauma to the right foot, which was an abrasive type of trauma, and did severe damage to the skin and subcutaneous tissue with tissue necrosis. The patient also had a severe cellulitis upon admission. He was treated with antibiotic therapy and surgical debridement. The patient's thrombophlebitis as well as the cellulitis have now become better, however, there is a raw area where the skin underwent necrosis and he may require a graft at a later date. Will continue attempts at granulation.

Later on, he stayed in the hospital for four or five days for a skin graft.

At the request of defendants and by arrangement with plaintiff's counsel, Dr. Claude S. Williams, an orthopedic surgeon, recognized as an expert in the field, examined Landry in his office in New Orleans on July 2, 1973. Dr. Williams took Landry's case history, which substantially coincided with Trahan's testimony. He testified that Landry did not appear to be in distress, that there was no detectable atrophy of the lower extremities, when Landry walked he would occasionally hold the right foot inward and walk on the lateral aspect of the foot, but on other occasions he was seen to walk normally without a detectable limp. Dr. Williams found no callouses, no thickening of the skin along the lateral or medial portion of the foot, and no detectable swelling of the ankle. Landry had a healed, diamond-shaped skin graft approximately 2 inches in diameter. There were 3 superficial scars about the back and inner aspect of the right leg in the vicinity of the ankle. The right ankle had normal range of motion, no detectable instability. Tendon function about the ankle and foot was intact. The pulses in the foot were normal. Landry was able to stand on his toes and walk on his heels. When he squatted down in a knee squat he complained of pain in the ankle. X-rays of the foot and ankle were normal. Dr. Williams was unable to explain the subjective symptoms or why Landry had been numb distally, since the alleged numbness was not in an area supplied by the nerves that would have been affected by the injury. Dr. Williams thought that Landry had approximately 5% impairment of function of the right leg, that no further treatment was indicated, and that Landry could return to any occupation he desired. Incidentally, however, his examination required only 15–20 minutes time.

Dr. Marion Joseph Trahan testified by deposition. He is a general surgeon. He is Board qualified, but not Board certified. He said Landry "had sustained a brush burn", third degree, through the entire skin, considered severe. There were no broken bones, no dislocation of the ankle. He removed all the dead tissue down to a good viable tissue. He did the skin graft on December 18. He saw Landry four times in January, 1973, and once in February. He did not see him again until September 26, 1973. He saw Landry in October, when he complained of his ankle and foot swelling, his ankle being unstable, stiff and painful. He did not see him again until April, 1974. He had no record of medications prescribed for Landry. On this scant foundation, Trahan offered the opinion that Landry had

not improved notably and that he could not return to work on boats or do any type of manual labor.

Here, we have the classic conflict. One doctor says that Landry has only a 5% disability and can go back to work. Another doctor, and Landry, say that he cannot. We must resist the temptation to say what we would have done had we been sitting on the jury, for the issue was for it to determine, *Pellegrin v. J. Ray McDermott & Co., Inc.*, 5 Cir. 1974, 504 F.2d 884.

Other considerations control the outcome of this appeal.

The suit was against Offshore Industries under the Jones Act, 46 U.S.C., Section 688, and against Odom Offshore Surveys, Inc., for negligence under general maritime law.

### The Direct Appeal

At the conclusion of the first trial the District Court awarded a new trial on the ground that one juror had not answered questions on the voir dire which might have caused him to be excused, either peremptorily or for cause, but added that he was also ordering a new trial because the amount of the verdict was so excessive as to shock the conscience of the court.

■ Under the facts and circumstances of this case the shock need not long delay us. It clearly fell within the exercise of sound discretion.[1] Whether the second trial should have been addressed to the issue of damages alone is moot. The second jury found the defendants liable and then proceeded to assess the damages, even as if damages had been the only issue submitted.

■ The judgment against the maritime tort defendant, Offshore General, Inc., awarded interest from the date of judicial demand. Subsequently, on motion, an amendment directed that interest should run from the date of the judgment. There is no reversible error here, *Canova v. Travelers Ins. Co.*, 5 Cir. 1969, 406 F.2d 410.

The Judgment of the District Court challenged in the direct appeal must be affirmed.

### The Cross Appeal

By their cross appeal, defendants seek reversal of the second verdict on the following issues:

#### I.

Did the district court, upon receipt of inconsistent jury answers to special interrogatories, have authority to return the verdict to the jury for further consideration?

#### II.

Upon resubmission of the original verdict to the jury, did the district court's instructions, coupled with the written directions of the form, have the effect of compelling the jury to disavow its finding of contributory negligence?

#### III.

Was the jury verdict sufficiently certain to support the entry of a judgment thereon?

#### IV.

Is the testimony of an expert actuary on loss of future earnings admissible where the hypothetical earnings upon which his computations are based have no basis in the evidence?

#### V.

Was the jury award of damages contrary to the great weight of the evidence?

We combine Grounds I, II, and III.

### The Jury Verdict

The Court propounded interrogatories to the jury, to which it responded, as follows:

1. Was defendant Offshore General, Inc. negligent, and, if so, was such negligence a cause of the injury to plaintiff? Yes

2. Was defendant Odom Offshore Surveys, Inc. negligent, and, if so, was

1. *Phoenix Indem. Co. v. Givens*, 5 Cir. 1959, 263 F.2d 858; *State Farm Mut. Auto Ins. Co. v. Scott*, 5 Cir. 1952, 198 F.2d 152; *Wood v. Holiday Inns, Inc.*, 5 Cir. 1975, 508 F.2d 167;

*Bonura v. Sea Land Service, Inc.*, 5 Cir. 1974, 505 F.2d 665; *Vidrine v. Kansas City Southern Ry. Co.*, 5 Cir. 1972, 466 F.2d 1217; *Bergeron v. Central Freight Lines*, 5 Cir. 1975, 504 F.2d 889.

such negligence a proximate cause of the injury to plaintiff?

Yes

3. In what amount of damages, expressed in dollars, is either defendant, or are both defendants, liable to plaintiff?

$238,998.00

4. Was plaintiff Paul Landry negligent and, if so, was his negligence a proximate cause of his injury?

No

5. By what percentage (disregarding the dollar figure in the answer to # 3) did plaintiff's negligence contribute to his injury?

75% [later erased by the jury]

After about an hour and a half of deliberation, the jury notified the marshal that it had returned a verdict, whereupon the following took place in open court:

COURT: "Mr. Williams, you were selected foreman of the jury. Has the jury reached a unanimous verdict?"

FOREMAN: "Yes, Your Honor, we have."

COURT: "Would you hand the verdict to the Courtroom Deputy, please."

(Court reviews verdict form.)

COURT: Mr. Williams, we have an inconsistent verdict here. I am going to ask the jury to retire again and reconsider the answers to questions 4 and 5, since I believe those questions, the answers to those questions are inconsistent, so will you please retire again and look at questions 4 and 5 and those directions."

(Whereupon the jury retired to deliberate and immediately returned to the Courtroom.)

COURT: "Did you correct the inconsistencies?"

FOREMAN: "Yes."

COURT: "May I have the verdict, please?"

(Whereupon the verdict form was read aloud in the Courtroom by the Courtroom Deputy.)

COURTROOM

DEPUTY: "Ladies and gentlemen of the jury, is this your verdict?"

(Whereupon each member of the jury answered in the affirmative.)

What had happened was that on its first appearance the jury had responded "No" to Interrogatory 4 (no contributory negligence) and then had written "75%" in answer to Interrogatory 5 (degree of contributory negligence).

Counsel for the defendants were present. The Court did not show them the verdict or announce its contents, but counsel did not ask to see it or to be told the contents. They made no objection when the jury was sent back for further deliberations. The jury returned forthwith, with the answer to Number 5 erased and, accordingly, left blank.

This was simply a case in which, obviously by inadvertence, the jury fell into an inconsistency with reference to one aspect of its verdict. The verdict had not been accepted. The jury had not been discharged. Counsel was present, making no inquiry and raising no objection. The jury quickly eliminated the one inconsistent answer. We can perceive of no sound reason for allowing this episode to abort the trial, necessitating a third trial of this case.

■ Defendants-appellants argue that upon return of the inconsistent answers to Interrogatories 4 and 5 the Court should have declared a mistrial and ordered a new trial. It is additionally asserted that sending the jury back for further consideration coerced the verdict. We cannot agree. See *Safeway Stores, Inc. v. Dial*, 5 Cir. 1963, 311 F.2d 595; *Travelers Insurance Co. v. Truitt*, 175 F.Supp. 67 (S.D.Tex., 1959), affirmed, 5 Cir., 280 F.2d 784, 790.

*The Testimony of the Actuary*

■ The stipulated W–2 forms filed by the plaintiff showed that in 1970 he earned $10,535; in 1971, $12,010; in the first ten months of 1972, $11,362.50. The actuary estimated lost wages to date of trial $29,-681. He further testified that Landry had a work life expectancy of 18 years. Calculated at $14,000 per year, commuted at 6%,

his loss of future earnings would be $155,-752. Calculated at $7,000 per year, similarly commuted, the lost future earnings would be $77,876. We have read the testimony of the actuary in full, including his answers to vigorous, incisive cross examination. In the midst of this testimony, the trial court, more than once, cautioned the jury that what the plaintiff might have made in future years was for the jury to decide.

The appellate attack on this testimony is clearly addressed to the weight, not to its competency or admissibility, therefore not a subject for appellate intervention.

On both direct and cross appeals, AFFIRMED.