ATCHISON, TOPEKA & SANTA FE RAILWAY CO., Appellant,

v.

Charles McCARTNEY, Appellee.

No. 7879.

Court of Civil Appeals of Texas, Beaumont.

March 3, 1977.

Rehearing Denied March 17, 1977.

William J. Cornelius, Jr., Galveston, for appellant.

J. Donald Bowen, Houston, for appellee.

DIES, Chief Justice.

This is a Federal Employers Liability Act case wherein Charles McCartney as plaintiff below was awarded $450,000 by a jury in a suit against the Atchison, Topeka and Santa Fe Railway Company, defendant below, and from which the latter perfects this appeal. The parties will be referred to as they were below, or by name. Santa Fe does not challenge the jury's findings of its negligence, but urges the award of $450,000 is excessive.

■ The subject of appellate review of excessive damages is covered extensively in the majority and concurring opinions found in *Collins v. Gladden*, 466 S.W.2d 629 (Tex. Civ.App.—Beaumont 1971, writ ref'd n. r. e.). See also, *Cezeaux v. Libby*, 539 S.W.2d 187 (Tex.Civ.App.—Beaumont 1976, no writ). It would do little good to repeat the admonitions and difficulties confronting an appellate court in discharging this responsibility, and only unduly lengthen this opinion. In the end, it is a judgment call on our part whether the jury award is supported by the evidence. And each case stands on its own bottom.

Charles McCartney, plaintiff, finished the twelfth grade in Silsbee High School in 1971. Following that, he went into the feed store business, and, when that failed, he went to work for Santa Fe on the bridge gang. Two months later, he became a brakeman, a job which requires climbing off and on cars. His pay as brakeman was about $1,500 per month. On July 16, 1974, at about 6:20 a. m., he was on the end of a gondola car loaded with rock. He was to "set the brake" which is "a round wheel that you turn by hand." This car had been uncoupled and "kicked" by the engine. This caused the rock-loaded car to "roll free". Plaintiff tried to set the brake, but it "wouldn't hold". An engine was backing down on him; he realized his car and the engine would come together hard; so he changed position to the "collar band" thinking his chances of holding there to be better. The "collar band" is lower than the brake platform. "When I was stepping down, I had my left foot down and when I was stepping down with my right foot, it slipped and the cars hit and kind of throwed it into the draw-bar or band as the draw-bar was going in." The draw-bar came in and caught his foot against the band. He looked down and "seen my shoe was bloody". He pulled off the shoe and saw that his little toe was in the shoe. Pieces of meat were also in the shoe. His sock was shredded and mingled in with his skin. He was losing blood. It became painful. The radio in the engine was out; so plaintiff hopped to a road, flagged a pickup, which took him to a Silsbee hospital. An ambulance then took him to St. Elizabeth Hospital in Beaumont.

Dr. Scott Wallace performed the first of a series of operations. After a week, he left the hospital with only the loss of the little toe "along with some meat". He then developed gangrene and returned to have the second and third toes down to the first joint removed, as well as the underneath part of the big toe. He was unable to move the big toe. His next operation was a skin graft. He tried walking then with a "boot", but the pain never left. He went back for further surgery. More bone was

removed. His condition did not improve; so further surgery removed all of the remainder of his toes and part of the ball of the foot (May 1975). He still couldn't function; so a fifth operation (August 1975) removed more bone. Following this, he developed neuromas in the foot, which causes pain when anything (such as a sock) touches the foot. A sixth operation removed the neuromas (January 1976). The circulation in the foot is not normal, causing the foot to be blue or black in color. He was on crutches at the time of the trial. The foot is cold and pains more when held down. He is unemployed, has moved in with his father because of finances. He cannot climb up a car or walk from one to another. He has no training for any kind of a sit-down job. It "bothers" him that he cannot support his family. He was twenty-one years old when the accident occurred.

His wife, Densy, described how plaintiff loved the outdoors, the pain plaintiff had suffered, and the anxiety he experienced from taking pain pills.

Dr. Kermit Veggeburg, an orthopedic surgeon who first saw plaintiff December 3, 1975, described the injury thusly: "[T]his is a crush of the whole foot. More especially, the toes, so you might say it's sort of like closing up something in a vise. . . . As it appears to me, you get lots of spasm of the blood vessels, you get a lot ripping and rending of the tissues deep down in the structure of the foot, in between the bones, and in the areas that were the greatest involved, there was not enough circulation, obviously, to maintain life. These areas died, and had to be gotten rid of. . . . [S]o I would say the whole foot was really involved."

Plaintiff was suffering a lot of pain when the doctor saw him; his foot was cold, sweating and cyanotic (blue). In addition to the conditions already described, plaintiff has developed Sudek atrophy of the right foot, a condition which itself is painful. If his condition persists, the doctor recommends a lumbar sympathetic block (injection of fluid on the side of back vertebra or surgical removal of the nerves). His future

is sedentary, not as a manual laborer. He is going to have some degree of pain for the rest of his life. "I would rate him as a person who can walk twenty-five percent of the time . . ." He will not be able to do the kind of work required of a brakeman.

Dr. Scott Wallace, the Beaumont orthopedist who performed the operations on plaintiff, said, "[W]e have had to do the other procedures mainly to attempt to get him a comfortable surface to walk on", but since the surgery "he's had some continued problem in that he has some vascular problems; he gets some discoloration when the foot's down."

Dr. Wallace was asked "whether or not he's [plaintiff is] going to be able to go back to work and become a productive man?" His answer was, "I hope he can." Dr. Wallace hoped plaintiff would be able to do clerical work inside an office, but he did not believe he could go back to his railroad work. Dr. Wallace also believed plaintiff had developed Sudek's atrophy. The doctor's previous optimism of plaintiff's prognosis turned out to be unfounded. He still has plaintiff on pain medication.

The elements which the jury in this case was instructed to consider were: past and future physical pain; past and future mental anguish; past loss of earnings; loss of future earning capacity, and disfigurement.

■ In determining whether a verdict is "excessive", the courts must review only that evidence favorable to the award, and the findings of the jury thereon will not be disturbed on the ground of "excessive" if there is any evidence to sustain the award. *Hammond v. Stricklen*, 498 S.W.2d 356 (Tex.Civ.App.—Tyler 1973, writ ref'd n. r. e.); *Monsanto Company v. Milam*, 480 S.W.2d 259 (Tex.Civ.App.—Houston [14th Dist.] 1972), affirmed, 494 S.W.2d 534 (Tex. 1973); *Sunset Brick & Tile, Inc. v. Miles*, 430 S.W.2d 388 (Tex.Civ.App.—Corpus Christi 1968, writ ref'd n. r. e.).

■ Here, we have a young man with a life expectancy of 49.4 years, and a work expectancy of 40.6 years earning $1,500

monthly who will never be able to return to his former employment, and he has no training for any other. It is undisputed he has suffered great pain, and will suffer pain probably indefinitely in the future, and the condition of the foot and the "boot" he must wear are to some extent disfiguring. These have led us to the conclusion that $450,000 is not an excessive award. This point is overruled. Appellant has one other point which we find to be without merit, and it is overruled.

The judgment of the trial court is affirmed.

AFFIRMED.

KEITH, Justice, dissenting.[1]

Contrary to what is said in the majority opinion, the award in this case is so excessive as to shock the conscience of this member of the court.

In his second question asked upon the trial of this cause, counsel for the plaintiff established the fact that plaintiff bore the nickname of "Sluggo". Counsel then succeeded in selling five of Sluggo's toes upon one foot to the Santa Fe for NINETY THOUSAND (tax proof) DOLLARS *each*. Thus, Sluggo and counsel left the courthouse with a judgment against a solvent defendant which ordered paid to him—in a lump sum, without discount, and tax free-his *gross* income for more than twenty-five years in the future.

We are here dealing with a young man in the prime of life with no disabling injuries other than those confined to his right foot. Yet, the majority finds that this award is not excessive and cites three cases. An examination of the cited cases reveals that six persons received severe and crippling injuries described in detail in the several opinions. Yet, these *six persons collectively* were awarded less than sixty percent of the sum awarded to our plaintiff.[2]

I recognize the right of a jury to assess damages; still, I would give recognition to the constitutional duty imposed upon trial judges and those of the intermediate courts of this state, to review such judgments to determine excessiveness. I decline to shirk this second duty. We have a young man who has lost his toes upon one foot. With a monetary award such as he now has almost in hand, there is little incentive for him to attempt other gainful employment. Indeed, with judicious management of this large sum of money, he can earn tax free interest far in excess of his gross earnings on the railroad.

Since I would require a substantial remittitur as a condition of affirmance and cannot convince my colleagues of the justness of my position, I dissent.

---

1. One of the more unpleasant duties of an intermediate appellate judge in Texas is that of passing upon claims that damage awards are excessive. So long as I continue in this office, I will strive to discharge that duty. I have concurred in requiring remittiturs. *Collins v. Gladden*, 466 S.W.2d 629, 637 (Tex.Civ.App.—Beaumont 1971, writ ref'd n. r. e.). I have filed a "Non-Concurring Opinion", expressing some degree of frustration as to the state of the law on the subject. *Cezeaux v. Libby*, 539 S.W.2d 187, 190 (Tex.Civ.App.—Beaumont 1976, no writ). While I have now come about in a full circle, I have not retreated from the position I staked out in *Collins*, supra. I now dissent.

2. Mrs. Stricklen was awarded $66,565.20 (498 S.W.2d at 358); Milam's award was $83,750 (480 S.W.2d at 267). Four plaintiffs in the *Sunset Brick Case* received the sums set opposite their respective names: Wessels—$14,250; Baggett—$26,250; Miles—$73,500; and Vincent—$2,625 (430 S.W.2d at 393, 394). The total amount awarded these six plaintiffs was $266,940.20.

On March 5, 1977, Sluggo's judgment will have a value of FOUR HUNDRED NINETY THOUSAND, FIVE HUNDRED (tax proof) DOLLARS, which will increase before our judgment is final.