Patricia Ann **KEELER** and William Joseph Keeler, Plaintiffs-Appellees,

v.

**RICHARDS MANUFACTURING CO., INC., et al., Defendants-Appellants.**

No. 86–1201.

United States Court of Appeals, Fifth Circuit.

June 1, 1987.

---

E. Earl Harcrow, Tim G. Sralla, Shannon, Gracey, Ratliff & Miller, Fort Worth, Tex., for defendants-appellants.

Roger Turner, T. Ray Guy, Jennifer A. Youpa, Dallas, Tex., for plaintiffs-appellees.

Before GARZA, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Defendants Richards Manufacturing Company and Richards Medical Company (collectively Richards) are appealing the judgment entered in favor of plaintiffs Patricia Keeler and her husband, William Keeler. The jury found that Richards had defectively manufactured a compression hip screw which broke after being implanted in Mrs. Keeler's hip. The Keelers were awarded over five hundred thousand dollars in damages after 32% of the total award was deducted as that part of the damages caused by the fault of Mrs. Keeler. Richards claims that the evidence is insufficient to support the verdict.

## I. *Facts*

Patricia Keeler broke her hip on the evening of July 18, 1982, when she accidentally slipped and fell in a friend's kitchen. She was taken to Plano General Hospital in Plano, Texas. Dr. Neal C. Small, an orthopedic surgeon at the hospital, decided to implant a compression hip screw into Mrs. Keeler's broken hip in order to assist in the healing process.[1] After the operation, Mrs. Keeler's hip appeared to be mending normally, and she did not experience any unusual complications as a result of the surgery.

On November 27, 1982, Mrs. Keeler entered Gaston Episcopal Hospital for additional surgery unrelated to her hip injury. A few days prior to her admission to the hospital, Mrs. Keeler reported experiencing a great deal of pain in her hip. Dr. William C. Head, Mrs. Keeler's regular orthopedic surgeon, examined her and discovered that the compression hip screw had broken. The broken screw was replaced with a hip prosthesis. This surgical implant eventually proved to be unsuccessful, and a second hip prosthesis had to be installed in August 1984.

Mr. and Mrs. Keeler filed this diversity action against Richards, the manufacturer and distributor of the broken hip screw, in the United States District Court. The Keelers alleged that the break in the compression hip screw was the result of a manufacturing or design defect, while Richards claimed that Mrs. Keeler had misused the screw by putting more than the recommended amount of weight on her hip. The jury determined that the screw had been defectively manufactured and that the defect was a producing cause of appellees' damages. The jury also found that appellants' defective manufacture of the compression hip screw breached an express warranty and an implied warranty of merchantability.

The jury did not make a finding that the breach of warranty was committed knowingly or that the compression hip screw was defectively designed. Additionally, Mrs. Keeler was determined to have been misusing the screw at the time the screw apparently broke because she put excess pressure on it by lifting a portable television set.[2] The jury found her thirty-two percent at fault for the damages she sustained.

The jury awarded Mrs. Keeler the following amounts of damages:

| | | |
|---|---|---|
| A. | Past Physical Pain and Mental Anguish | $100,000.00 |
| B. | Future Physical Pain and Mental Anguish | $100,000.00 |
| C. | Past Physical Impairment | $100,000.00 |
| D. | Future Physical Impairment | $150,000.00 |
| E. | Past Medical Expenses | $ 39,400.00 |
| F. | Future Medical Expenses | $150.000.00 |
| G. | Past Disfigurement | $ 50,000.00 |
| H. | Future Disfigurement | $100,000.00 |

Mr. Keeler was compensated for his losses as follows:

| | | |
|---|---|---|
| A. | Past Lost Consortium | $ 20,000.00 |
| B. | Future Lost Consortium | $ 20,000.00 |

Appellants moved for a directed verdict before submission of the case to the jury and for judgment notwithstanding the verdict. They further requested a remittitur of the damages portion of the jury award or a new trial. The district court denied all of appellants' motions and, on February 26,

1. The compression hip screw is a device specially designed for fixation of broken hips. It consists of three different parts, the hip screw plate, the lag screw, and the compression screw. The hip screw plate is attached to the femur with screws. On the top end of the plate is a barrel. The lag screw is screwed into the femoral neck and head and fits into one end of the barrel of the hip screw plate. The broken pieces of bone are then drawn together by inserting the third piece, the compression screw, into the other side of the barrel. The compression screw and the lag screw have mating threads, and by turning the compression screw, the surgeon can draw together the lag screw and the plate, there-by also drawing together the fractured bones. The Richards' compression hip screw has a keyway, which is a slot in the lag screw with a mating key in the barrel. This prevents the femoral head from rotating relative to the femur, and further assists in fixating the broken bones to assist in healing.

2. The compression hip screw is designed as a partial weight bearing device. Mrs. Keeler, however, testified that she had moved a small, portable television set from the floor to a tabletop the evening before her hip began causing her pain.

1986, entered judgment against appellants in the amounts of $536,790 plus prejudgment interest for Mrs. Keeler, $27,200 plus prejudgment interest for Mr. Keeler, and $22,000 for attorneys' fees. There was timely notice of appeal.

## II. *Defective Manufacture of the Compression Hip Screw*

Appellants claim that the district court erred in denying their motion for directed verdict, motion for judgment notwithstanding the verdict, and alternatively, motion for new trial on the ground that the evidence presented at trial did not support the jury's finding that the compression hip screw was defectively manufactured. A jury verdict, however, may be reversed and a new trial ordered only if the verdict is against the great weight of the evidence. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612 (5th Cir.1985). "The decision to grant or deny a motion for new trial generally is within the sound discretion of the trial court and will not be disturbed unless there is an abuse of that discretion or misapprehension of the law." *Dixon v. International Harvester Co.*, 754 F.2d 573, 586 (5th Cir.1985).

The standard for granting a motion for directed verdict or motion for judgment notwithstanding the verdict is even more stringent:

[T]he Court should consider all of the evidence ... but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied.... [I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc). After reviewing the record, we find that there is ample evidence to support the jury's verdict and that the district court did not err in refusing to grant appellants' motions.

■ Two of appellees' expert witnesses, John Harcourt and Dr. Gary Hansen, testified that the lag screw component of the compression hip screw contained at least four irregularities which they considered to be manufacturing defects. They also concluded that any one of the identified defects could have been a producing cause of Mrs. Keeler's injuries. The first manufacturing defect they found concerned the length of the lag screw's internal threads. Appellants' design specifications required the lag screw's internal threads to be not more than 1.125 inches in length. John Harcourt testified that he measured the subject lag screw and found it to be 1.1875 inches in length. Dr. Hansen also examined the subject lag screw and confirmed that, in his opinion, the internal threads were "not in conformance with blueprint specifications."

Mr. Harcourt and Dr. Hansen testified that the presence of excess internal threads would weaken the lag screw by creating an area of unintentional stress concentration. They stated that, as a result of this defect, the lag screw's resistence to fatigue failure was decreased, which eventually caused the screw to break.

The second defect was evidenced by testimony that an unacceptable amount of metal debris was present in the lag screw at the time it was inserted into Mrs. Keeler's hip. John Harcourt testified that this debris would interfere with the surgeon's ability to compress the screw properly, thereby allowing the bones greater than normal movement. In turn, this failure to tighten properly would place a higher level of stress on the screw. Mr. Harcourt considered the resultant stress to be a producing cause of the screw's failure.

The claim of a third defect was based upon evidence that the subject screw's radius was slightly less than that of an exemp-

lar hip screw furnished by Richards. John Harcourt testified that the smaller radius would result in greater stress concentration and that the subject screw was not as strong as it otherwise should have been. Finally, as a fourth defect, there was also some testimony that the hip screw failed to comply with the American Society of Testing Materials' (A.S.T.M.'s) standard of 35% ductility.

Appellants undertook to discredit the value and accuracy of the evidence concerning the alleged manufacturing defects. In effect, they are only relitigating the issues that already have been decided by the jury. They claim, for example, that appellees' experts were incorrect in their measurements of the lag screw and that the internal threads were less than 1.125 inches in length. They also contend that any debris which may have been present in the lag screw could not have been a producing cause of Mrs. Keeler's injuries because x-rays revealed that the hip screw had functioned properly in pulling Mrs. Keeler's bones together and that the hip appeared to be healing satisfactorily. The jury, however, heard these contentions and chose to believe appellees' witnesses rather than those of appellants. There is sufficient evidence to support the jury's finding that Richards defectively manufactured the subject compression hip screw, and the district court correctly decided not to "second-guess" the jury's verdict by granting any of appellants' motions.[3]

### III. *Damage Award*

#### A. Disfigurement

Appellants claim that there is insufficient evidence to support the jury's award of $150,000 to Mrs. Keeler for past and future disfigurement because there is nothing in the record to indicate that Mrs. Keeler suffered any serious scarring or other physical deformity as a result of the broken hip screw or the subsequent surgeries needed to repair the hip. They contend that, in contrast to physical impairment, disfigurement damages are awarded only in cases involving a physical blemish which visibly detracts from a person's appearance or which otherwise injures or impairs a person's beauty or symmetry. The Texas cases recognize as an element in establishing damages in disfigurement the subjective feelings of embarrassment or depression created by the disfigurement. *See Goldston Corp. v. Hernandez*, 714 S.W.2d 350, 353 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) (disfigurement damages awarded to a man who was depressed and embarrassed about his scarred foot and amputated toe); *Northwest Mall Inc. v. Lubri-Lon International*, 681 S.W.2d 797, 804 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (disfigurement damages awarded to a woman with three hip surgeries prior to trial and three more anticipated who considered herself deformed because of the resultant scarring); *Armellini Express Lines v. Ansley*, 605 S.W.2d 297, 312 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.) (disfigurement damages awarded to a thirty-two-year-old woman who suffered substantial injury to her body and face such that she considered herself an "ugly old hag"); *Texas Farm Products Co. v. Leva*, 535 S.W.2d 953, 959 (Tex.Civ.App.—Tyler 1976) (disfigurement damages awarded to a young man with an amputated little finger and a hand with areas of exposed tissues who was embarrassed to shake hands with anyone).

■ Appellees claim in their brief that Mrs. Keeler sustained extensive permanent scarring as a result of the two hip replacement operations. There is, however, a total lack of evidence in the record to support that contention. The record also does not contain any testimony to the effect that Mrs. Keeler considered herself to be disfigured in any way. The mere fact that Mrs. Keeler is required to use crutches or a cane is not evidence of disfigurement; it is evi-

---

3. The jury also found that the alleged defective manufacture of the hip screw breached an express warranty and an implied warranty of merchantability. Because we find that the jury's verdict on the defect claim is supported by the evidence, we need not consider appellants' contention that there was insufficient evidence to support this allegation.

dence of disability.[4] In short, the record is devoid of any evidence of disfigurement as opposed to physical impairment.

It is well-established that "a mere scintilla of evidence is not sufficient to sustain a jury determination." *Tarlton v. Exxon*, 688 F.2d 973, 976 (5th Cir.1982). In this case, there was not even a scintilla of evidence of Mrs. Keeler's disfigurement, and the jury should not have been given the opportunity to consider the matter. We determine that the district court erred in failing to grant appellants' motion for judgment notwithstanding the verdict on the issue of disfigurement and reverse the damage award of $150,000.

### B. Future Medical Expenses

■ Under Texas law, "[r]ecovery for future medical expenses requires a showing that there is a reasonable probability that such medical expenses will be incurred in the future." *City of Rosenberg v. Renken*, 616 S.W.2d 292, 293 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). "No recovery can be allowed based upon pure speculation." *Roth v. Law*, 579 S.W.2d 949, 956 (Tex.Civ.App.—Corpus Christi 1979, no writ). Appellants claim that the jury award of $150,000 to Mrs. Keeler for future medical expenses is not supported by the evidence. We agree.

The record indicates that only Dr. Vetter Frank Cody and Dr. William C. Head testified concerning Mrs. Keeler's future medical expenses. When asked what the future would hold for Mrs. Keeler, Dr. Cody, a psychiatrist, stated that "there's a lot of uncertainty. No one really knows just what's going to happen in situations like is [sic]." Dr. Head testified that Mrs. Keeler's medical expenses could vary a great deal. He also stated that "this is one of those situations that if it were simply routine follow up checks in the office and

periodic x-rays could probably be 2 or $300 a year. Whereas, if she ended up having to have more surgery you could be facing thousands of dollars...." No other evidence was presented.

■ "In reviewing a jury award of damages on appeal, the court is actually reviewing the district court's denial of a motion for a new trial. The standard of review of the denial of such a motion is whether the district court abused its discretion." *Brooks v. Great Lakes Dredge-Dock Co.*, 754 F.2d 539, 541 (5th Cir.1985) (citations omitted). If the jury awards an unreasonable amount in light of the evidence, a new trial may be ordered,[5] or the award may be reduced by suggesting a remittitur to the maximum amount the jury could have awarded. *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983).

■ Since the district court erred in allowing a damage award which included an excessive amount of future medical expenses to stand, we reverse for a new trial on the issue of damages unless appellees are willing to accept a remittitur for the amount of the excessive future medical expenses. The new trial on the issue of damages will encompass physical pain and mental anguish and physical impairment as well as medical expenses. This is so because the question of future medical expenses is not so distinct and separate from the other damage issues "that a trial of it alone may be without injustice." *Westbrook*, 754 F.2d 1233, 1242 (5th Cir.1985) (quoting *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931)). It will not include retrial of the issue of disfigurement since there was a complete absence of evidence on the issue and the district court should have directed a verdict

---

**4.** Appellees claim that *Atchison, Topeka & Santa Fe Railroad Co. v. McCartney*, 549 S.W.2d 228 (Tex.Civ.App.—Beaumont 1977, writ ref'd n.r.e.) supports their contention that crutches alone are disfiguring. This reliance is misplaced. While the court found that McCartney was disfigured to some extent because he was required to wear a special "boot" in order to walk, he also was disfigured because he had lost all of his

toes and a portion of the ball of his foot. *Id.* at 231.

**5.** "A new trial on the issue of damages, once liability is established, is proper." *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1242 (5th Cir.1985).

or granted judgment notwithstanding the verdict. The maximum non-speculative amount Mrs. Keeler could have received for future medical expenses was $6,000.[6] *Cf. Roth v. Law,* 579 S.W.2d at 956 (jury award of $20,000 was excessive where the only testimony of future medical expenses was physician's "conservative" estimate of $10,000). Appellants, therefore, are entitled to a new trial on damages unless appellees consent to a remittitur of $97,920.[7]

## IV. *Conclusion*

We determine that the evidence is more than sufficient to support the jury's finding on the issue of Richards' defective manufacture of the compression hip screw. We find, however, that the district court erred in failing to grant appellants' motion for judgment notwithstanding the verdict on the issue of disfigurement. We reverse and render on this issue. Additionally, the damage award is excessive, and the district court erred in denying appellants' motion for new trial. We, therefore, order a new trial on the issue of damages unless appellees accept a remittitur of $97,920.

The judgment of the district court is

AFFIRMED ON THE MERITS. REVERSED AND RENDERED IN PART, AND REMANDED FOR A NEW TRIAL IN PART ON DAMAGES.

---

**6.** Dr. Head testified that Mrs. Keeler had a life expectancy of twenty years. The amount of the award for future medical expenses, therefore, should be equal to $300, the maximum estimate of non-speculative yearly expenses, multiplied by the twenty year life expectancy, or $6,000.

**7.** In determining the amount of the remittitur, we take into account Mrs. Keeler's thirty-two percent liability. The remittitur, therefore, is equal to sixty-eight percent of the total excess future medical expenses, $97,920.