Esther R. KOCIEMBA and William J. Kociemba, Plaintiffs,

v.

G.D. SEARLE & CO., Defendant.

Civ. No. 3–85–1599.

United States District Court, D. Minnesota, Third Division.

Feb. 16, 1989.

**1522**

Michael V. Ciresi, Roger P. Brosnahan, David L. Suggs, Roberta Walburn of Robins, Kaplan, Miller & Ciresi, Minneapolis, Minn., for plaintiffs.

Paul Strain and Elizabeth Honeywell of Venable, Baetjer & Howard, Baltimore, Md., and Madge S. Thorsen of Oppenheimer, Wolff & Donnelly, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

RENNER, District Judge.

### INTRODUCTION

Before the Court are defendant G.D. Searle & Co.'s motions for judgment notwithstanding the verdict pursuant to Fed. R.Civ.P. 50(b)(1), and for a new trial pursuant to Fed.R.Civ.P. 59(a)(1). On December 1, 1988 the Court held a hearing on the motions and took them under advisement. The Court, at that time, also heard arguments on plaintiff's[1] post-trial motions. These motions will be addressed in a separate opinion.

Defendant G.D. Searle & Co. asserts numerous grounds in support of its motions. First, it asks the Court to enter JNOV on plaintiff's intentional misrepresentation claim. Defendant argues that plaintiff presented no evidence of any intentional misrepresentation by defendant.

Second, defendant seeks JNOV on plaintiff's claim under Minn.Stat. § 325F.67 (False Statement in Advertising) on the grounds that plaintiff presented no evidence of a written advertisement by defendant. Defendant argues in the alternative that it is entitled to a new trial because the Court erred in allowing plaintiffs' attorneys to make references during trial to advertisements which defendant had placed in medical journals, but which were not read by plaintiff's physician.

Third, defendant asserts that it is entitled to JNOV on plaintiff's failure to test claim. Defendant argues that there is no independent cause of action for negligent failure to test under Minnesota law. Defendant argues in the alternative that it is entitled to a new trial because the Court erroneously instructed the jury that under Minnesota law a manufacturer has a continuing duty to test.

Fourth, defendant argues that it is entitled to a new trial because the Court improperly refused to allow defendant to challenge the credibility of one of plaintiffs' key witnesses.

Fifth, defendant seeks a new trial on the grounds that United States Magistrate Janice M. Symchych exceeded her authority under 28 U.S.C. § 636 (The Magistrate Act) in the course of accepting the jury's verdict. Additionally, defendant argues that the Magistrate's actions violated Article III of the United States Constitution, as well as defendant's due process rights and Seventh Amendment right to trial. Defendant also claims that the Magistrate improperly coerced the jury into reaching a verdict.

Sixth, defendant claims that it deserves a new trial because the jury's award of $7 million in punitive damages is excessive and not supported by the evidence. Defendant asks in the alternative that the Court reduce the punitive damage award. Defendant also claims that the award violates the 8th Amendment to the United States Constitution, and Article I, § 5 of the Minnesota Constitution, as well as the Fifth and Fourteenth Amendments to the United

---

1. Both Esther Kociemba and her husband, William, are named plaintiffs in this action. Any reference to a single plaintiff should be construed as a reference to Esther Kociemba unless otherwise specified.

States Constitution, and Article I, § 7 of the Minnesota Constitution.

Finally, defendant claims that the Court should order a new trial because of juror misconduct. Defendant has presented evidence that, contrary to the Court's instructions, members of the jury were exposed to certain extraneous materials. Defendant claims that these materials prejudiced the jury.

## FACTS

Esther and William Kociemba brought suit against G.D. Searle & Co. ("Searle") in 1985, alleging that Searle's Cu-7 intrauterine contraceptive device ("IUD") had caused Esther to become infertile. Plaintiff based her claim on numerous theories of liability, including defective design, defective manufacture, failure to warn, failure to test, intentional misrepresentation, and false advertising. Plaintiff's husband claimed loss of consortium. Trial began on May 16, 1988. The trial lasted for approximately 3½ months,[2] and involved extensive expert medical testimony and hundreds of exhibits.

At the conclusion of the evidence, the Court denied defendant's motion for a directed verdict. On September 9, 1988, after ten days of deliberations, the jury informed the Court that it had reached a verdict.

Because the Court was unavailable at the time, United States Magistrate Janice M. Symchych received the verdict. Because defendant has various claims relating to the Magistrate's receipt of the verdict, the Court will set out at length the events that transpired on the afternoon of September 9, 1988.

The jury entered the courtroom at 2:45 p.m. Magistrate Symchych asked the jury foreman if the jury had reached a verdict. The foreman responded that it had. The foreman presented the special verdict form, which contained 17 questions, to the Magis-

trate. Upon reviewing the form Magistrate Symchych stated:

> Members of the jury, I see that there are not answers to each and every one of the interrogatories on the verdict form and that there have been answers supplied only for interrogatory numbers 9, 10, 11, 14, 15, 16 and 17. I'm going to ask you to adjourn to the deliberation room and formally fill in the remaining interrogatories that haven't been answered. When you have completed that, you can let the bailiff know and we will come to court at that point in time.

Searle's counsel then asked for permission to approach sidebar. Magistrate Symchych instructed counsel to await the sidebar until after the jury had left. Once the jury had left the courtroom, Magistrate Symchych held a sidebar conference. Searle's counsel objected to the Magistrate sending the jury back to the jury room to fill in the unanswered questions on the special verdict form. Searle's counsel moved for a mistrial, and asked the Magistrate to declare the jury hung and dismiss it.

Magistrate Symchych responded that because the foreman of the jury had indicated that the jury had reached a verdict, she would recommend[3] to Judge Renner that the motion be denied. Searle's counsel then renewed his mistrial motion on the additional ground that the Magistrate's direction to the jury implied that they could only answer the questions left blank, and could not reconsider the questions already answered. The court was then recessed.

Approximately ten minutes after the jury had retired to complete the verdict form, the Magistrate received word that it had in fact completed the verdict form. (Symchych aff. at 2). The jury did not immediately return to the courtroom, however, because the Magistrate was awaiting a phone call from the Court. The Court called thereafter, and instructed Magistrate Symchych that if the jury returned with a completed special verdict form she

---

**2.** This notwithstanding the fact that counsel represented to the Court that the trial would take 5–6 weeks.

**3.** Magistrate Symchych stated that because she was a United States Magistrate, she could not make a final ruling on a dispositive motion.

was to accept it and discharge the jury. (Symchych aff. at 2).

The court was then reconvened. The Magistrate again asked the foreman if the jury had reached a verdict. He responded "Yes, ma'am, now we have." The clerk then read the verdict into the record.

Searle then requested that the jury be polled. Each juror stated that the verdict was his or her own. Searle again moved for a mistrial at sidebar. Magistrate Symchych stated that she would recommend that the motion be denied. The Magistrate then discharged the jury.

The jury found that Searle had not been negligent in either designing or manufacturing the Cu–7 and that plaintiff William Kociemba had not suffered loss of consortium. The jury also found that Searle had negligently failed to warn of risks associated with the Cu–7, that Searle had negligently failed to test the Cu–7, that Searle had made intentional misrepresentations about the Cu–7, and that Searle had violated Minn.Stat. § 325F.67 (False Statement in Advertising). The jury also found that these actions by Searle had caused plaintiff's injuries.

The jury awarded plaintiff $1.75 million in compensatory damages ($750,000 for pain and disability, and $1 million for emotional distress).[4] The jury also assessed $7 million in punitive damages against Searle.

## DISCUSSION

Federal Rule of Civil Procedure 50(b) states in part:

> Not later than ten days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict.... A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.

A motion for entry of judgment notwithstanding the verdict can be granted "only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party." *Jacobson v. Pitman–Moore, Inc.,* 582 F.Supp. 169, 174 (D.Minn.1984) quoting *Kayser v. Rockwell Graphic Systems, Inc.,* 666 F.2d 1233, 1235 (8th Cir.1982) (emphasis in original). The trial court must view the evidence in the light most favorable to the prevailing party and must assume that the jury resolved all conflicts in the evidence in favor of the prevailing party. *Jacobson,* 582 F.Supp. at 174, citing *Harris v. Pirch,* 677 F.2d 681, 683 (8th Cir.1982).

Federal Rule of Civil Procedure 59(a)(1) states:

> A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

### I. *Intentional Misrepresentation.*

Plaintiff's physician, Dr. Scanlan, testified at trial that Searle's representatives made two pertinent statements to him concerning the Cu–7. First, the doctor testified that Searle's detailmen told him that the Cu–7 was "excellent for use" with nulliparous women. Second, he testified that Searle represented to him that the Cu–7 was "safe and effective."

■ Defendant claims that as a matter of law its statement that the Cu–7 was "excellent for use" with nulliparous women cannot support a claim of intentional misrepresentation because the statement is an opinion. To be actionable, a representation must be a fact that is susceptible of knowledge; *i.e.* one that is discoverable. *Davis v. Re–Trac Manufacturing Co.,* 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967).

Defendant asserts that the phrase "excellent for use" is merely an expression of

---

**4.** The Court subsequently reduced the $1,000,-000 award for emotional distress to $400,000 pursuant to Minn.Stat. § 549.23, which limits recovery for intangible loss to $400,000. Plaintiffs' post-trial motions challenge the constitutionality of this statute.

an opinion as to quality or level of performance. Defendant cites *Presidio Enterprises Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674 (5th Cir.1986). In *Presidio Enterprises*, the court stated "such words as 'easy,' 'prime,' . . . *'excellent,'* are regarded in law as mere puffing or dealer's talk upon which no charge of misrepresentation can be based." 784 F.2d at 686 (emphasis added) (quoting *Carlay v. Federal Trade Commission*, 153 F.2d 493, 496 (7th Cir. 1946)). *See also Chase Resorts, Inc. v. Johns–Manville Corp.*, 476 F.Supp. 633 (E.D.Mo.1979), *aff'd* 620 F.2d 203 (8th Cir. 1980).

■ If the party making the representation has special knowledge of the subject, upon which the injured party relies, however, a court can consider a representation that would normally be an opinion as one of fact. *Hedin v. Minneapolis Medical & Surgical Inst.*, 62 Minn. 146, 64 N.W. 158, 159 (Minn.1895); *Toole v. Richardson–Merrell, Inc.*, 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967); Restatement (Second) of Torts § 542(a) (1977). The *Hedin* court stated: "Where parties possess special learning or knowledge on the subject to which their opinions are given, such opinions are capable of approximating the truth." 64 N.W. at 159.

■ In the instant case, Searle had "special learning and knowledge" concerning use of the Cu–7 with nulliparous women. Searle tested the Cu–7, and then made the decision to target the nullip market. Although Dr. Scanlan is not a medical layman, he lacked the experience or training to make a determination as to the appropriateness of using the Cu–7 with nulliparous women. He was entitled to rely on defendant's statement that its product was "excellent for use" with nulliparous women.

Additionally, defendant's claim that its statement was mere opinion is weakened by the statement's specificity. Defendant's statement was not simply a general commendation of its product. Defendant had told Scanlan that he could use the product with a specific subgroup of patients; i.e. women who had never borne children.

■ The Court also notes that there are strong policy reasons against broadly applying the "puffing" and "dealer's talk" line of reasoning to a pharmaceutical product to be inserted into the human body. Pharmaceutical salesmen should not have as much leeway in "puffing" their wares as would a used car salesman.

This Court holds that under the reasoning of *Hedin*, the jury could consider defendant's statement that the Cu–7 was "excellent for use" with nullips as a statement of fact, and not as an opinion. The jury could reasonably have concluded that defendant intentionally misrepresented the safety of the Cu–7 by stating that the device was "excellent for use" with nulliparous women.

Defendant also claims that its statement that the Cu–7 was "safe and effective" is true as a matter of federal law. The Food and Drug Administration ("FDA") approved the Cu–7 as "safe and effective for use as recommended in the submitted labeling." This Court has previously rejected defendant's argument that FDA approval of the Cu–7 preempted plaintiff's state law tort claims. *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1300 (D.Minn.1988).

Defendant concedes that the Court's preemption ruling exposes it to liability under state law. However, defendant argues that this ruling cannot give the jury the power to denominate as false what the FDA has found to be true.

■ The Court's instruction to the jury on intentional misrepresentation states in part:

[P]laintiff must prove . . . by a preponderance of the evidence:

[T]hat Searle made a positive, unqualified representation being either conscious of ignorance of the truth, or aware that the information on which the company relied was not adequate or dependable enough to support such a positive, unqualified assertion.

The fact that the FDA had determined that the Cu–7 was safe and effective does not preclude a jury from deciding that *Searle* was aware that the information upon which

*it* relied was not adequate or dependable enough to support its positive, unqualified statement that the Cu–7 was safe and effective.

■ Defendant claims that the FDA's approval of the drug amounted to a legal conclusion that the drug was safe and effective. The phrase "safe and effective" as used by the FDA is a term of art. *United States v. Generix Drug Corp.*, 654 F.2d 1114, 1115 n. 2, (5th Cir.1981) *rev'd on other grounds*, 460 U.S. 453, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983). The term indicates that the FDA has a certain quantum of data about the drug ("substantial evidence") that shows that the drug is safe, and that based on this evidence the FDA has approved the drug for sale to the public. *Id.* The term does not mean that the FDA has made a legal conclusion for state tort law purposes.

■ A plaintiff can also establish a claim for intentional misrepresentation by showing that the defendant concealed a material fact, knowing that the plaintiff would act on the presumption that no such fact existed. *Rochester Methodist Hospital v. Travelers Insurance Co.*, 728 F.2d 1006, 1018 (8th Cir.1984). In addition, a person who has special knowledge of material facts to which other persons do not have access, has a duty to disclose those facts. *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210, 1228 (1987).

■ Defendant claims that plaintiff presented no evidence that it had concealed a material fact. Defendant points out that the physician package insert which accompanied the Cu–7 referred to "pelvic infection" as a possible "adverse reaction." However, defendant did not reveal that in its own clinical trial, pelvic inflammatory disease was second only to cramps and excessive bleeding as the most common disorder associated with Cu–7 use. Plaintiff's physician, Dr. Scanlan, testified:

> If I would have known that pelvic inflammatory disease was that great a risk second only to fairly minor symptomatic problems, I would never have inserted it in nulliparous women and probably not in any women.

(transcript at 1986). The jury could reasonably have concluded that Searle intentionally misrepresented the safety of the Cu–7 by concealing a material fact.

This Court holds that defendant is not entitled to JNOV as a matter of law, and that there was sufficient evidence as to this claim to support the jury's verdict. Accordingly, defendant's motion for JNOV on plaintiff's claim of intentional misrepresentation will be denied.

## II. *False Statement in Advertising.*

■ Defendant argues that it is entitled to a JNOV on plaintiff's false advertising claim under Minn.Stat. § 325F.67 because plaintiffs presented no evidence that the defendant's physician package insert was an advertisement within the meaning of the statute. The Court instructed the jury that for purposes of the act, advertisements are:

> [R]epresentations disseminated in any manner or by any means for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase of a product.

Defendant claims that plaintiff presented no evidence that defendant intended the physician package insert to induce physicians or patients to purchase the Cu–7. However, plaintiff's evidence did include an internal Searle memorandum which stated:

> The FDA Advisory Committee is recommending that IUD labeling be revised to include information regarding increased risk of PID with IUD's. We must be alert to any labeling changes on IUD's as this could possibly affect our marketing program for the Cu–7.

Pl. Exh. 847. Viewing the evidence in the light most favorable to plaintiff, plaintiff presented enough to allow a reasonable jury to conclude that defendant's Cu–7 physician package insert was an advertisement.

■ Defendant also claims that plaintiff presented no evidence that Dr. Scanlan, in his practice, relied on any statements in the physician package insert. Dr. Scanlan testified that the insert he reviewed referred to "pelvic infection" but not to "Pel-

vic inflammatory disease." As previously noted, Dr. Scanlan testified that the information concerning pelvic inflammatory disease would have altered his decision to use the Cu–7 in nulliparous women such as Esther Kociemba.

■ Defendant argues in the alternative that it is entitled to a new trial because it was prejudiced by references at trial to advertisements that defendant had placed in national medical journals, but which plaintiff's physician did not read. The Court admitted these into evidence. The Court here reaffirms its earlier decision to allow plaintiffs to refer to those advertisements at trial. The Court notes that these advertisements were admitted not only for purposes of plaintiff's false advertising claim, but also to establish defendant's state of mind for purposes of punitive damages.

Accordingly, defendant's motion for JNOV, or in the alternative a new trial on plaintiff's claim under Minn.Stat. § 325F.67 will be denied.

## III. *Failure to Test.*

Defendant argues that the Court should enter JNOV on plaintiff's failure to test claim because Minnesota law does not recognize an independent cause of action for negligent failure to test. The Court included in the special verdict form two questions relating to failure to test. The first asked "Was G.D. Searle & Co. negligent in the testing of the Cu–7 worn by Esther Kociemba?" The second asked "Was such negligence a direct cause of Esther Kociemba's injuries?" By including failure to test interrogatories on both negligence and causation, the Court recognized failure to test as an independent cause of action which could support the verdict standing alone.

■ Minnesota law has traditionally recognized three causes of action based on negligence in products liability cases: negligent design, negligent manufacture and negligent failure to warn. *Bilotta v. Kelley Co.,* 346 N.W.2d 616, 622 (Minn.1984); *Peppin v. W.H. Brady Co.,* 372 N.W.2d 369, 374 (Minn.App.1985). Plaintiff cor-

rectly asserts, and defendant concedes, that a manufacturer has a duty to inspect and test its products. *Willmar Poultry Co. v. Carus Chemical Co.,* 378 N.W.2d 830, 836 (Minn.App.1985); *Nicklaus v. Hughes Tool Company,* 417 F.2d 983, 986 (8th Cir.1969); *Borel v. Fibreboard Paper Products,* 493 F.2d 1076, 1090 (5th Cir. 1973). Defendant argues, however, that this duty is subsumed in one of the three causes of action mentioned above.

■ The Court finds defendant's argument persuasive. The Court elevated the duty to test to an independent cause of action by including an interrogatory on the special verdict form asking whether Searle's negligent failure to test caused plaintiff's injuries.

Presumably, the reason that manufacturers are under a duty to test their products is to discover defects or dangers associated with use of the products. Once the manufacturer has discovered a defect or danger the manufacturer should either change the product's design or manufacturing process, or warn consumers of the danger associated with using the product.

Thus, unless the manufacturer's breach of its duty to test leads the manufacturer to produce a product that is defective in design, manufacture, or warning, no injury can result. If the manufacturer designs the product safely, manufactures the product safely, and provides an adequate warning of dangers inherent in the use of the product, then a failure to test the product cannot, standing alone, cause any injury. The duty to test is a subpart of the other three duties because a breach of the duty to test cannot by itself cause any injury.

This view is reflected in the cases recognizing a duty to test. In *Willmar Poultry,* the court held that the trial court did not abuse its discretion by including a jury instruction that stated that a manufacturer had a duty to test its products. The court approved the trial court's statement that "[t]he duty to develop adequate warnings and instruction may well *encompass* a duty to test a product to discover defects." 378 N.W.2d at 836 (emphasis added). The

**1528**

court also noted that the language used by the trial court to instruct on the duty to test was drawn from the proposed Minnesota JIG for negligent manufacture products liability actions.

This Court holds that the duty to test, as it exists under Minnesota law, is not a separate cause of action. The duty to test is a subpart of duties to design a product non-negligently, manufacture a product non-negligently, and provide adequate warnings of dangers associated with its use. Accordingly, defendant's motion for JNOV on plaintiffs' claim for failure to test must be granted.

Defendant has moved in the alternative for a new trial based on the courts' alleged error in instructing the jury that a manufacturer has a continuing duty to test its products.

Fed.R.Civ.P. 50(c)(1) requires a court to conditionally rule on a party's alternative new trial motion even if the court has granted the party's motion for JNOV.

The Court in the instant case instructed the jury that:

> A manufacturer has a duty to use reasonable care to test its products to protect those who will use them from unreasonable risk of harm. The duty to test arises prior to marketing the product and continues throughout the period in which the product is in use.

Defendant argues that the Court's instruction that a manufacturer's duty to test continues throughout the period in which the product is in use is erroneous as a matter of law. Defendant argues, and plaintiff concedes, that no case decided under Minnesota law has recognized a continuing duty to test. Defendant claims that such a duty would impose a crushing burden on manufacturers to continually retest old products over and over as long as those products are in use.

■ Minnesota products liability law recognizes a continuing duty to warn of dangers associated with using a product. *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 833 (Minn.1988). In *Hodder*, the Minnesota Supreme Court held that a manufacturer is under a continuing

post-sale duty to warn in certain "special cases." 426 N.W.2d at 833. The *Hodder* court identified the special circumstances in that case that warranted imposing a continuing duty to warn.

First, the court noted that it had been evident since the late 1950's that there were problems with the Goodyear product at issue. 426 N.W.2d at 833. Further, Goodyear continued to sell the product until 1969, advertised it until 1977, and still sells tires and tubes for use with the product. *Id.* Finally, the court pointed out that Goodyear had undertaken a duty to warn of defects associated with the product (presumably when it was first marketed). *Id.*

■ This Court has already held that the duty to test is a subpart of the duty to warn. It is logical that a continuing duty to warn would have as a subpart a continuing duty to test. Although Minnesota courts have up until now only recognized a continuing duty to warn, recognizing a continuing duty to test which is subsumed as a part of the continuing duty to warn is a consistent extension of existing law. Therefore, this Court holds that its instruction to the jury concerning a manufacturer's continuing duty to test is not erroneous. *See Nicklaus*, 417 F.2d 983, 986 (8th Cir.1969) (manufacturer has a duty to test "during and after the process of manufacture").

■ Of course, any continuing duty to test would also be limited to "special cases." *Hodder*, 426 N.W.2d at 833. Courts should only apply a continuing duty to test when the type of special circumstances identified by the *Hodder* court exist: knowledge of a problem with the product, continued sale or advertising of the product, and a pre-existing duty to warn of dangers associated with the product.

Limiting the continuing duty to test to cases where the manufacturer has knowledge of problems with a product alleviates defendant's concern that this duty will impose a crushing burden on manufacturers to retest products. If a manufacturer has no information concerning potential dan-

gers associated with a product, it will be under no duty to continually test the product. Conversely, if a manufacturer does obtain sufficient credible information that a product already in use is potentially dangerous, the manufacturer should test that product to determine the extent of any danger, and then issue an appropriate warning or product recall.

▆ In the instant case, the jury heard evidence that defendant knew for a considerable period of time that its product posed special dangers for nulliparous women. Defendant continued to sell its product, and continued to market it for use with nulliparous women. Like the defendant in *Hodder,* defendant in this case initially undertook a duty to test the product and warn of dangers associated with its use. Clearly, this case is the type of "special case" identified by the *Hodder* court. Accordingly, defendant's motion in the alternative for a new trial is conditionally denied.

## IV. *Testimony of Dr. Fives–Taylor.*

During the trial, the Court struck some of the testimony of Dr. Fives–Taylor. The Court told the jury that the testimony was being stricken for "reasons of concern to the Court alone." (transcript at 5618). Searle contends that the Court erred by not allowing it to present evidence to the jury as to the reason why the Court struck the testimony since that would have reflected on Dr. Fives–Taylor's credibility.

The Court ruled on this issue during the trial. It now reaffirms its prior decision.

## V. *The Magistrate Issue.*

Defendant claims that it is entitled to a new trial because Magistrate Symchych acted improperly while receiving the jury's verdict on the afternoon of September 9, 1988. Defendant raises numerous claims relative to the Magistrate's actions.

### 1. 28 U.S.C. § 636.

28 U.S.C. § 636 governs the jurisdiction, powers and temporary assignment of Unit-

ed States Magistrates. Under § 636(c), a magistrate may preside over "a jury or nonjury civil matter" only "upon the consent of [all] the parties." Case law has interpreted this section as meaning that magistrates may not preside over an "integral" or "essential" part of a trial without the consent of the parties. *United States v. Ford,* 824 F.2d 1430, 1435–36, 1438 (5th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 741, 98 L.Ed.2d 776 (1988). Defendant argues that the Magistrate issued a jury instruction, that this instruction was an "essential" part of the trial, and that consequently the Magistrate exceeded her authority under Section 636(c).

▆ Under Section 636(b)(3), a magistrate may be assigned "additional duties" as long as they are not inconsistent with the Constitution or laws of the United States. The legislative history of this subsection states that a magistrate would be permitted to "accept returns of jury verdicts where the trial judge is unavailable...." H.R. No. 94–1609, 94th Cong.2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 6162, 6172. Additionally, Rule 16(E)(6) of the Local Rules for the United States District Court for the District of Minnesota provides that a magistrate may "[a]ccept petit jury verdicts in civil cases in the absence of a judge."

Defendant does not dispute the power of the Magistrate to accept the jury's verdict. Defendant asserts that the Magistrate exceeded her authority under Section 636(b)(3) by sending the jury back to complete the special verdict form. Defendant argues that this was a jury instruction and an integral part of a trial that may not be delegated to a magistrate absent consent of the parties.

▆ Although the case law is sparse, the Court holds that jury instructions are an integral part of a trial. A court may not delegate the duty of instructing a jury to a magistrate under the "additional duties" provision of § 636(b)(3).[5] *United States v. Rivera–Sola,* 713 F.2d 866, 874

---

5. In making this holding, the Court addresses only the situation where a magistrate both formulates and delivers a jury instruction. The

Court expresses no opinion as to the propriety of a magistrate re-reading instructions written by a trial judge.

(1st Cir.1983); *People v. Torres,* 72 N.Y.2d 1007, 534 N.Y.S.2d 914, 531 N.E.2d 635 (1988).[6]

■■■ The issue, then, is whether the Magistrate issued a "jury instruction" in this case. The Court concludes that she did not. Defendant strenuously argues that by sending the jury out of the courtroom to fill in the empty blanks on the special verdict form, the Magistrate issued a formal "jury instruction." Defendant speculates that the jury did not fill in all of the blanks on the special verdict form because it was deadlocked on those questions. Defendant concludes that the Magistrate "instructed" a jury which had indicated it was deadlocked to continue deliberating, and "oversaw" those deliberations.

In support of this theory defendant cites *People v. Torres, supra.* In *Torres,* the jury sent out a note stating that it was unable to reach a verdict. The judge, who was absent, was informed of this by phone. The judge directed a court officer to tell the jury that it should continue to deliberate. The court officer gave the jury the judge's instruction. Neither the attorneys nor the defendant were present, and the officer's remarks were not recorded.

The New York Court of Appeals reversed defendant's conviction. The court stated:

Reversal of this conviction is required because the Trial Justice improperly delegated a judicial duty to a nonjudicial staff member at a critical stage of the proceedings and thus permitted trial proceedings to be conducted in his absence. Contrary to the People's contention, an instruction to *continue deliberations* when the jury has *indicated its inability to reach a verdict* is not a mere "ministerial" matter.

72 N.Y.2d at 1008–1009, 534 N.Y.S.2d 914, 531 N.E.2d 635 (emphasis added). Defendant alleges that this same scenario occurred in the instant case.

Here, however, we have two significant differences. First, the jury did not state that it was unable to reach a verdict. Rather, the jury sent a note to the Court stating that it had reached a verdict. When asked by the Magistrate whether they had reached a verdict, the foreman responded affirmatively. There was no indication that the jury was deadlocked.

Second, the Magistrate did not instruct the jury to continue deliberations. The Magistrate merely directed the jury to record their verdict by filling in the blank spaces on the special verdict form. The Court concludes that the Magistrate performed an administrative act by requiring the jury to record its verdict. The Magistrate did not exceed her authority under § 636(b)(3).

■■■ The facts support the Court's conclusion. Ten minutes after being sent back to the jury room, the jury announced that it had completed its task. This amount of time is consistent with a group of eight people leaving a courtroom, retiring to a jury room, situating themselves, and recording their verdict in full. It is hard to imagine that a deadlocked jury, which had deliberated for ten days, could reach agreement on ten of the seventeen questions in only ten minutes. It is also noteworthy that when the jury recorded its answers to the ten questions it found for defendant on certain claims and for plaintiff on others.[7]

### 2. Article III, Seventh Amendment, Due Process.

Defendant also argues that the Magistrate violated Article III of the United

---

**6.** The Court notes that the Eighth Circuit has recently taken a restrictive view of section 636(b)(3). In *United States v. Trice,* 864 F.2d 1421 (8th Cir.1988) the Eighth Circuit, following the Fifth Circuit's decision in *Ford,* held that section 636(b)(3) did not give a magistrate the power to conduct voir dire over the objections of a party.

**7.** Defendant also argues that the Magistrate exceeded her authority by dismissing the jury over

its objection. As previously noted, Local Rule 16(E)(6) allows a magistrate to accept a jury verdict. The authority to dismiss the jury is ancillary to the authority to accept its verdict. Also, the Court conferred with the Magistrate by phone before the jury's fully recorded verdict was accepted. The Court instructed the Magistrate to accept the verdict and dismiss the jury if the jury had recorded its verdict.

States Constitution, violated defendant's Seventh Amendment right to a trial by jury, and deprived defendant of its right to due process of law.

Article III of the United States Constitution requires that the judicial power of the United States be vested in courts having life tenure and undiminishable compensation. Consequently, inherently judicial tasks must be performed by Article III Judges. . See, e.g., *Glidden Co. v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); *Ex parte Bakelite Corp.,* 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929). Instructing a jury is an inherently judicial task.

The Seventh Amendment requires a judge to preside over jury trials, including the instruction of the jury. *Capital Traction Co. v. Hof,* 174 U.S. 1, 13–14, 19 S.Ct. 580, 585, 43 L.Ed. 873 (1899). Defendant asserts that by "instructing" the jury the Magistrate violated its right to a trial by jury. Because the Court has already concluded that the Magistrate did not "instruct" the jury, defendant's claims must fail.

The Court will pause, however, to distinguish one case cited by defendant in support of its position that the Magistrate violated Article III. In *United States v. De La Torre,* 605 F.2d 154 (5th Cir.1979), the Fifth Circuit held that a magistrate had violated Article III by ruling on a party's request to have the court re-read certain definitions included in the jury instructions. 605 F.2d at 156. In *De La Torre* a judge designated a magistrate to receive the jury's verdict. During deliberations, the jury sent the court a note asking the court to provide them with the portion of the charge that dealt with conspiracy. The judge authorized the magistrate to re-read the portion of the charge dealing with conspiracy.

After the magistrate had completed the recitation, defense counsel approached the bench and requested that the definitions of certain terms used in the charge be re-read as well. The magistrate decided to ask the jury whether what he had already read satisfied their question. Defense counsel objected to the magistrate's refusal to re-read the items he had requested. The magistrate then asked the foreperson whether what he had read answered the jury's question. She replied that it had. The magistrate did not re-read the material requested by defense counsel. In reversing defendant's conviction, the court stated: "It is the defendant's right to have an Article III judge rule on his counsel's objections and requests for instructions to the jury...." 605 F.2d at 155–156.

Searle argues that the Magistrate denied it the right to have an Article III judge instruct the jury. However, in the instant case Searle made no request for any jury instruction. The Magistrate held a sidebar conference immediately after the jury had left the room. Defendant's counsel objected only to the jury being sent back to the jury room to complete the form, and moved only for a mistrial on that basis. Defendant made no request for any instruction, cautionary or otherwise, and made no objection to the language used by the Magistrate.

The rationale of *De La Torre* is not applicable. It is worthwhile to note, also, that the *De La Torre* court stated "nor do we hold that the procedure followed here might not have resulted in error merely harmless...." 605 F.2d at 156, citing *United States v. Boswell,* 565 F.2d 1338 (5th Cir.1978).

In *Boswell,* a magistrate presided over a jury trial for four hours due to the judge's illness. The Fifth Circuit refused to grant a new trial because the only objections made during the time that the magistrate presided were to the effect that the prosecutor was misquoting testimony. 565 F.2d at 1342. The magistrate informed the jury that he had not heard the testimony, and seeing as they had heard it, he would leave it to them to judge what a given witness had said. The Court held that the defendant was not prejudiced by the magistrate's actions. *Id.* The Court believes the instant case is closer to *Boswell* than to *De La Torre.*

Therefore, the Court finds that the Magistrate did not violate Article III. Nor did the Magistrate's actions violate defendant's Seventh Amendment right to a trial by jury, or defendant's right to due process of law.

### 3. *Allen* Charge.

■■■■■■ Defendant also argues that the Magistrate's directions to the jury amounted to a functional verdict urging instruction, commonly known as an *Allen* charge.[8] An *Allen* charge typically arises in cases where the jury informs the court that it is unable to reach a verdict. The judge then gives the jury the *Allen* charge, which is essentially an instruction to continue deliberating and to try to reach a verdict. If, however, the charge has the effect of coercing the jury into reaching a verdict, the verdict must be set aside. *United States v. Webb*, 816 F.2d 1263, 1267 (8th Cir.1987).

■■■ To indicate to the jury that it must reach a verdict is deemed coercive because it suggests that the jury must reach a unanimous verdict. Courts generally avoid this problem of coerciveness by including language in the *Allen* charge cautioning the jurors that any verdict to which they agree must be the product of their conscientiously held beliefs. *Webb*, 816 F.2d at 1265 n. 4.

Defendant claims that in the instant case the Magistrate gave the jury an *Allen* charge, failed to include any cautionary language, and therefore coerced the jury into agreeing to answers to the questions left blank on the special verdict form. Defendant asserts that the Magistrate's direction to "formally fill in the blanks" indicated to the jury that they had to reach a verdict on the unanswered questions. Of course, this argument is dependent upon defendant's speculation that the jury was deadlocked on the questions that it had not filled in.

The Magistrate's direction to the jury to complete the verdict form was significantly different from an *Allen* charge.[9] An *Allen* charge is given when a jury indicates that it is unable to reach a verdict. In this case, the jury twice indicated that it had reached a verdict. At no time during the deliberations did the jury communicate to the Court that it was deadlocked on any of the questions on the verdict form.

Additionally, an *Allen* charge instructs jurors to continue deliberations, and to reconsider their positions and to listen to the other jurors' points of view. The Magistrate's direction to the jury in the instant case did not tell the jurors that they had to continue deliberating. Nor did it indicate, as defendant suggests, that the jurors would have to remain in the jury room until they had deliberated and reached agreement on the unanswered questions. Rather, the Magistrate's direction only stated that the jury was to "formally fill in the blanks." Defendant itself has stated in its brief that this direction "suggested that the jury should [fill in the blanks] in a formal, mechanical manner without the need for further deliberations."

Defendant also argues that the Magistrate's direction was coercive because it did not include language cautioning jurors not to give up conscientiously held beliefs. However, since nothing in the direction indicated that the jury would be deliberating further, there was no need for such a cautionary instruction. Nor would a magistrate be empowered to give such an instruction.

Defendant further argues that the short time period that it took the jury to fill in the blanks on the verdict form shows that the jury was coerced into agreement by the Magistrate's actions. There is case authority supporting the proposition that when a jury returns a verdict shortly after receiving an *Allen* charge, this short time period

---

8. So named after *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

9. The Court notes initially that one major difference is that an *Allen* charge is a jury instruction. The Court has already concluded that the Magistrate's direction to the jury was not a "jury instruction." However, because the Magistrate's direction still could have had the same sort of coercive effect associated with an *Allen* charge, the Court will address defendant's claim that the direction was coercive.

suggests that the charge was coercive. *United States v. Cook,* 663 F.2d 808, 811 n. 4 (8th Cir.1981). However, in this case there was no *Allen* charge given. Also, the time period involved, ten minutes, is so short as to be compatible only with a jury's mechanical recording of its verdict. It would be extraordinary for a truly dead-locked jury to be able to reach agreement and record its answers to ten out of seventeen questions, with some questions being answered in defendant's favor and some in plaintiff's, in this short period of time.

The Court believes the instant case to be parallel to *Landry v. Offshore Logistics, Inc.,* 544 F.2d 757 (5th Cir.1977). In *Landry,* a jury returned an inconsistent verdict. The jury stated both that plaintiff was not contributorily negligent, and that the degree of plaintiff's contributory negligence was 75%. The judge sent the jury back to correct the inconsistency. Defendant did not object. The jury returned shortly thereafter with a corrected verdict. The Fifth Circuit ruled that the judge's action in sending the jury back to correct the verdict form did not coerce the jury into reaching a verdict. 544 F.2d at 761.

The facts in the instant case are much the same. Although defendant correctly points out that the defendants in *Landry* did not object to the judge's actions, while defendant in this case did, the fact that an objection was or was not made does not lessen the *Landry* court's conclusion that sending the jury back to correct its verdict was not coercive.

This Court holds that the Magistrate did not improperly. coerce the jury into reaching a verdict.

In the event that the Court is mistaken in the above conclusions the Court notes that the questions the jury originally recorded on the verdict form, before the Magistrate took any action, are fully capable of supporting the verdict.[10] Before the Magistrate took any action, the jury had recorded answers for questions 9, 10, 11, 14, 15, 16, and 17. The jury answered "yes" to question 9, which asked whether Searle had made intentional misrepresentations about the Cu–7. The jury also answered "yes" to question 10, the interrogatory which asked whether defendant's intentional misrepresentations were a direct cause of plaintiff's injuries. Finally, the jury answered questions 14–17, which were the damages questions.[11]

■ A partially completed special verdict form can support a verdict as long as the questions that are answered will support the verdict, and the unanswered questions, if answered in favor of the party against whom judgment is rendered, would

---

10. Defendant claims that the Court cannot rely on the verdict as originally returned because the Magistrate read into the record only the questions the jury answered, and not the answers. The jury possessed several special verdict forms. Defendant argues that the jurors could have completed a new, entirely blank special verdict form when they retired to comply with the Magistrate's request that they record their answers to the other questions. Defendant asserts that the possibility that the jurors used a new verdict form and possibly supplied new answers to those seven questions precludes this Court from knowing what answers the jurors originally supplied for those seven questions, before any of the Magistrate's acts took place.

At the Court's request, Magistrate Symchych has filed an affidavit relating to these events. Her affidavit states that the answers to questions 9, 10, 11, 14, 15, 16 and 17 which are currently recorded on the special verdict form in the official clerk's file are the same answers that were on the special verdict form originally presented to her by the jury. (Symchych aff. at 3).

Also, the Court notes that on the completed special verdict form ultimately returned by the jurors, next to the date, is written in pen "2:05 p.m." This is the time that the jury first announced that it had reached a verdict. The Court is of the opinion that this establishes that the jury used the same verdict form it originally presented to the Magistrate when it returned to the jury room to supply answers to the remaining questions.

Therefore, the Court concludes that the answers to questions 9, 10, 11, 14, 15, 16, and 17 were the same when the verdict form was first submitted to the Magistrate as when they were read into the record by the Magistrate as part of the verdict.

11. The jury also answered yes to question 11, which inquired whether Searle had violated the Minnesota Consumer Protection Act by engaging in false advertising. However, the jury failed to record an answer to question 12, the causation interrogatory following question 11. Hence, only the claim for intentional misrepresentation can support the verdict if the Magistrate's actions were unauthorized.

not render the judgment erroneous. *Skyway Aviation Corp. v. Minneapolis, N. & S. Railway Co.*, 326 F.2d 701, 704 (8th Cir.1964); *Bridges v. Chemrex Specialty Coatings, Inc.*, 704 F.2d 175, 180 (5th Cir. 1983). The answers originally recorded by the jury in the instant case are fully capable of supporting the verdict. This is true even if the jury had found for defendant on all of the unanswered questions.

Accordingly, defendant's motion for a new trial on all grounds related to the actions of the Magistrate in receiving the jury's verdict will be denied.

### VI. *United States v. Arpan.*

On Thursday, September 1, 1988, during the jury's deliberations, the jurors sent a note to the Court which inquired into the meaning of the term "unanimous decision."[12] The Court responded that the jurors had to be unanimous before they could agree on a question.[13]

Defendant argues that the recent decision of the Eighth Circuit in *United States v. Arpan*, 861 F.2d 1073 (8th Cir.1988) mandates that this Court grant a new trial. In *Arpan*, a criminal case, the jury sent the district court a note which asked:

> If we do not have a *unanimous decision* on a count—(a split decision)—how do we record this on the count(s)?

The district court responded:

> As to any count in the indictment, you *may not return a verdict* unless your verdict as to that *count is unanimous.*

861 F.2d at 1077 (emphasis in original).[14]

The *Arpan* court held that the district judge's answers to the two juror notes

constituted reversible error because the answers indicated that the jurors were required to reach a verdict, and therefore denied the jury the option of remaining hung. 861 F.2d at 1077–78. The court stated: "The potential prospect of a hung jury is necessarily a constitutional alternative to our system of requiring proof beyond a reasonable doubt." 861 F.2d at 1077.

Defendant contends that the Court's answer to the jurors' question regarding unanimity in the instant case is similarly defective. Defendant maintains that the Court's answer amounts to reversible error because the Court failed to inform the jurors that they did not have to reach a verdict.

In the Court's view, both the questions and answers at issue in the *Arpan* case are fundamentally different from the question and answer in the instant case.

In *Arpan*, the jurors clearly stated that they were deadlocked on two counts. They gave no indication that they did not understand the meaning of the term "unanimous." The district court in effect told the jurors "that they must return a verdict, guilty or not guilty." 861 F.2d at 1077. The *Arpan* court did not reverse the district court simply because it failed to tell the jury it could remain hung. The court rejected the district court's answer because it effectively informed the jurors that their only options were either a unanimous verdict of guilty or a unanimous verdict of not guilty. *Id.*

As set forth before, here, the jurors note did not state that they were dead-

---

**12.** The note from the jury read as follows:

When you say we have to reach an (sic) unanimous decision, does that mean we all have to agree one way or the other totally. Or can a unanimous decision be reached by agreeing that our decision is unanimous whether it's 7 to 1, 6 to 2, 5 to 3, 4 to 4 etc.

**13.** The Court's response stated:

Before you can agree to a particular question you must be unanimous. That is, you must all agree.

**14.** The jurors subsequently sent another note which stated:

We are *not* in agreement on 2 counts. Will the lack of a verdict on 2 counts affect our

decisions on the rest of the counts? If so, how?

861 F.2d at 1075 n. 6 (emphasis in original). The district court's response stated in pertinent part:

... you may return a verdict as to each count *upon which you are unanimous.*

... Please notify me by note as to whether you wish to return at this time the verdicts *upon which you are unanimous.*

Upon return of the verdicts on *which you are unanimous* you may then retire ... to deliberate upon the counts on *which you have not reach (sic) the unanimous verdict.*

861 F.2d at 1077 (emphasis in original).

locked. Rather, the jurors inquired into the definition of the term "unanimous decision." In response, the Court stated that before they could *agree* to a particular question, they had to be unanimous; they all had to agree. The Court did not instruct the jurors that before they could reach a *verdict,* they all had to unanimously agree.

In *Arpan* the district court stated "you may not *return a verdict* unless your verdict as to that count is unanimous." (emphasis added). In the instant case the Court told the jury that *before* they could *agree* they had to be unanimous. The Court did not tell the jurors that they *had* to agree. The statement "Before you can agree to a particular question you must be unanimous" is different from the statement "you may not return a verdict unless your verdict ... is unanimous." [15]

Accordingly, defendant's motion for a new trial on the ground that the Court's answer to the jurors' question of September 1, 1988 was erroneous will be denied.

### VII. *Punitive Damages.*

The jury found that Searle had acted with a willful indifference to the rights and safety of others and awarded plaintiff $7,000,000 in punitive damages. Searle argues that the Court must vacate this award in its entirety. In the alternative, Searle asks that the Court substantially reduce the punitive damages award.[16]

Searle asserts that the Court must vacate the punitive damages award because it is unconstitutional. First, Searle argues that the $7 million punitive award violates the excessive fines clause contained in the Eighth Amendment to the United States Constitution, and in Article I, § 5 of the Minnesota Constitution. Second, Searle contends that the jury's award of punitive damages violates the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, § 7 of the Minnesota Constitution.

Searle fails to cite any case where a court has held that an award of punitive damages violated the excessive fines clause of either the United States or Minnesota Constitutions. One court has recently held that an award of punitive damages which was one hundred times greater than the compensatory award did not violate the Eighth Amendment. *Kelco Disposal, Inc. v. Browning–Ferris Industries, Inc.,* 845 F.2d 404, 410 (2d Cir.1988) *cert. granted,* — U.S. ——, 109 S.Ct. 527, 102 L.Ed.2d 559 (1988).[17]

■ This Court is aware of no authority to support the proposition that a punitive damage award of $7 million in a case where the jury also assessed an award of compensatory damages of $1.75 million is invalid under either the United States or Minnesota Constitutions.

■ Searle next argues that the punitive award violates the due process clauses of the United States and Minnesota Constitutions. Searle claims that the Minnesota punitive damages statute, Minn.Stat. § 549.20, offends due process because it imposes no limit on the amount of punitive damages a jury can award, and provides no standards to aid the jury in fairly assessing punitive damages.

---

**15.** The instructions given to the jurors by the Court before deliberations began state:

But do not surrender your honest conviction as to the weight or effect of the evidence, solely because of the opinion of your fellow jurors, or for the *mere purpose of returning a verdict.*

(emphasis added) The jury was on notice that it did not have to return a unanimous verdict. Nothing in the Court's response to its question suggests otherwise.

**16.** This request is essentially a request for the Court to order a remittitur, and the Court will treat it as such.

**17.** The Court notes that the United States Supreme Court has granted certiorari to decide the Eighth Amendment issue in *Kelco.* The Court will not try to anticipate the Supreme Court's decision in *Kelco.* The Court believes that whatever the outcome in that case, the punitive damage award in this case, which was four times greater than the compensatory award, is significantly different from the punitive award in *Kelco,* which was one hundred times greater than the compensatory award.

The Court rejects Searle's argument. First, the Minnesota punitive damages statute does not give juries unbridled discretion in awarding punitive damages. If a jury awards punitive damages which are not supported by the evidence, the court has a duty to grant a new trial or to reduce the excessive verdict. *Kemp v. Ervin,* 651 F.Supp. 495, 506 (N.D.Ga.1986).

Second, the punitive damage statute is not standardless. The statute lists nine separate factors which a jury should consider when deciding what amount of punitive damages to award.[18] This statute provides more guidance for a jury than does the common law, which it replaced. Searle has cited no cases, under either a statute or common law, to support its claim that the discretion allowed to jurors in assessing punitive damages violates due process.

The United States Supreme Court has stated that "[p]unitive damages have long been a part of traditional state tort law." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984). This Court finds that allowing a jury to assess punitive damages without a set maximum amount or rigid standard does not violate due process.

Searle also claims that it is entitled to a new trial on all the issues because the Court erroneously received into evidence for purposes of punitive damages, testimony of acts by Searle which occurred after plaintiff's Cu–7 had been removed. Searle asserts that this evidence improperly suggested to the jurors that they could award punitive damages on behalf of all women injured by the Cu–7.

The Court has previously ruled that evidence of acts committed by defendant after plaintiff's Cu–7 was removed would be admissible to establish defendant's pre-injury intent, as long as plaintiff could also produce pre-injury evidence supporting punitive damages. The Court stands by that ruling.

In the alternative, Searle argues that the Court should reduce the punitive damage award because it is excessive. In a diversity action, state law governs the issue of the excessiveness of a verdict. *England v. Gulf & Western Mfg. Co.,* 728 F.2d 1026, 1029 (8th Cir.1984). However, the issues of whether the Court should grant a new trial or remittitur are procedural questions to be decided under federal law. *England,* 728 F.2d at 1029; *Hale v. Firestone Tire & Rubber Co.,* 820 F.2d 928, 936 n. 1 (8th Cir.1987).

The Eighth Circuit has stated that a new trial is required where a punitive damage award is the result of passion and prejudice. *Hale,* 820 F.2d at 936. A district court should grant remittitur only when the verdict is not the result of passion and prejudice, yet is "so grossly excessive as to shock the court's conscience." *American Business Interiors, Inc. v. Haworth, Inc.,* 798 F.2d 1135, 1146 (8th Cir. 1986); *Quachita National Bank v. Tosco Corp.,* 716 F.2d 485, 488 (8th Cir.1983).[19]

Here, the Court instructed the jury that in awarding punitive damages, the jury

---

**18.** Searle points out that these factors are not exclusive, and therefore the jurors can consider other factors as well. While this may be true, this does not mean that the statute is standardless.

**19.** Whether a court applies the "shocks the conscience" standard, or some other standard, the underlying rationale in remittitur cases appears to be that a court should reduce a damage award if it cannot be supported by the evidence. *See, e.g., Jordan v. Clayton Brokerage Co., Inc.,* 861 F.2d 172, 174–75 (8th Cir.1988); *Goldstein v. Manhatten Industries, Inc.,* 758 F.2d 1435, 1448 (11th Cir.1985); *Keeler v. Richards Mfg. Co.,* 817 F.2d 1197, 1202 (5th Cir.1987); *Kemp,* 651 F.Supp. at 508. Accordingly, courts have held that it is appropriate to set a remittitur so as to

permit recovery of the highest amount the jury could have awarded. *Carter v. District of Columbia,* 795 F.2d 116, 135 n. 13 (D.C.Cir.1986); *Keeler,* 817 F.2d at 1202; *Holman v. Mark Industries, Inc.,* 610 F.Supp. 1195, 1206 (D.Md.1985), *aff'd* 796 F.2d 473 (4th Cir.1986). The standard used by the Eighth Circuit when reviewing a remittitur decision is consistent with this line of reasoning. In *Quachita National Bank,* the court stated: "the standard we will apply in determining whether there was an abuse of discretion in ordering the remittitur is whether the remittitur was ordered for an amount less than the jury could reasonably find." 716 F.2d at 488 (quoting *Slatton v. Martin K. Eby Construction Co.,* 506 F.2d 505, 508–09 (8th Cir.1974)).

should consider factors relating to the purpose of punitive damages, including, but not limited to: [20]

1. The seriousness of the hazard to the public arising from the defendant's misconduct;

2. The profitability of the misconduct to the defendant;

3. The duration of the misconduct and any concealment of it;

4. The attitude and conduct of the defendant upon discovery of the misconduct;

5. The number and level of employees involved in causing or concealing the misconduct;

6. The financial condition of the defendant;

7. The degree of the defendant's awareness of the hazard and of its effectiveness.

 Defendant contends that the Court should order a remittitur of a substantial portion of the $7 million punitive damage award because it is "shockingly excessive." However, in view of the evidence presented by plaintiff at trial, and guided by the factors as set forth in the Minnesota punitive damage statute and the jury's instructions, the Court cannot say that the jury's punitive damage award is so unsupported by the evidence as to be grossly excessive.

At trial, plaintiff presented evidence which would have allowed a reasonable jury to conclude that defendant knowingly placed millions of American women, especially nulliparous women, at risk of serious infection, loss of fertility, and surgery for removal of internal organs. Plaintiff also presented evidence that could have allowed the jury to reasonably conclude that responsibility for this conduct was shared throughout defendant's corporate hierarchy, and that the conduct continued for over ten years.

The jury heard evidence that defendant reaped approximately $80 million in profits from the sale of the Cu–7, and that Searle's book value is $860 million. The jury

awarded plaintiff damages according to a ratio of 4 to 1 between punitive and compensatory. This Court simply cannot say that the verdict is so shockingly excessive, in light of the evidence and Minnesota law, that the Court has grounds to force plaintiff to choose between a new trial or a reduced amount of punitive damages.

Finally, Searle asserts that the punitive damage award is excessive in light of the fact that approximately 500 Cu–7 related lawsuits are currently pending against it nationwide. It argues that if similar punitive damage awards result in these pending cases, it will be financially overwhelmed, and possibly forced out of business. In support of this assertion that the punitive damage award is excessive, Searle points to the Minnesota punitive damage statute, which states in part:

> Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including ... the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons, and the severity of any criminal penalty to which the defendant may be subject.

Minn.Stat. § 549.20 subd. 3. The Court did not include this portion of subdivision 3 in its instruction to the jury.

 Federal Rule of Civil Procedure 50 states in part:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests.... No party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.....

---

**20.** These factors were taken from the Minnesota punitive damages statute, Minn.Stat. § 549.20, subd. 3.

Additionally, a party may not assign as error the court's failure to give an instruction which it did not otherwise request. *Besse v. Burlington Northern, Inc.*, 79 F.R.D. 623, 626 (D.Minn.1978).

Defendant cannot rely on the above-quoted portion of subdivision 3 because defendant did not object to the Court's failure to instruct the jury that it could consider the total effect of other punishment in rendering its punitive damage award. *Goffstein v. State Farm Fire & Cas. Co.*, 764 F.2d 522, 524–25 (8th Cir.1985); *Porter v. United Steel & Wire Co.*, 436 F.Supp. 1376, 1382 (N.D.Iowa 1977). Not only did defendant not object to the Court's instruction, but the defendant's proposed jury instructions did not include any reference to the total effect of other punishment.

Further, defendant presented no evidence at trial as to the number of other lawsuits pending against it. Defendant did not bring forward any evidence as to its potential exposure to compensatory and punitive damages awards in favor of similarly situated plaintiffs. Defendant simply failed to take advantage of the opportunity presented by section 549.20 to inform the jury of defendant's potential liability exposure, and allow the jury to include this factor in its calculation of any punitive damage award.[21] Essentially, defendant is now asking the Court to *sua sponte* consider the potential effect of punitive damage awards in future cases, even though this evidence was not before the jury. The Court has already held that the jury's punitive damage award is not shockingly excessive in light of the evidence. Were the Court at this time to hold that the verdict is excessive because of the potential of future punishment, as defendant urges, the Court would be presenting plaintiff with an alternative between a new trial or remittitur based on evidence that was never considered by the jury.

The Court believes that to do so would present serious problems related to plaintiff's right to trial by jury under the Seventh Amendment to the United States Constitution. *See Carter v. District of Columbia*, 795 F.2d at 135 n. 13. This Court cannot order plaintiff to choose between a new trial or remittitur on the grounds that the jury's verdict may be excessive in light of evidence which the defendant chose not to present to the jury.[22]

---

21. The transcript of the jury instruction conference shows that the reason that the Court did not include the language from subdivision 3 about the total effect of other punishment in its instruction to the jury was because defendant neither requested the instruction, nor presented any evidence of other potential punishment at trial. (transcript of conference on 08/23/88 at 152).

22. The Court feels compelled to note at this time that it has grave reservations about the punitive damage award's potential effects on future plaintiffs. As has been noted, there are currently approximately 500 Cu–7 related lawsuits pending against Searle. If Searle is forced to pay a like amount in punitive damages in but 125 of these 500 lawsuits, the company will essentially be wiped out. Searle's book value is about $860 million.

If large punitive damage awards swallow up the available pool of funds, it is possible that many injured plaintiffs with legitimate claims will receive nothing. This would be tragic. Because of this possibility, the Court is sorely troubled by the size of the punitive damage award in this case.

This dilemma has been identified by other courts as well. A district court confronted with a similar mass tort case stated:

> The punitive damage award in any one of the actions might constitute a reasonable deterrent. Yet, each plaintiff is permitted to try her case in a vacuum, oblivious to other pending actions or to prior punitive damage awards. Each plaintiff may then receive a punitive damage award with the result that the cumulative awards financially destroy the defendant.

*In re Northern Dist. of Cal. "Dalkon Shield" Prods.Liab.Litig.*, 526 F.Supp. 887, 899 (N.D.Cal. 1981) *rev'd on other grounds*, 693 F.2d 847 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

Minnesota has attempted to deal with this problem by enacting subdivision 3 of Section 549.20. As discussed above, this subdivision allows a defendant to present evidence to the trier of fact concerning defendant's total potential punitive damage liability exposure. If defendant presents such evidence, the trier of fact must weigh the total effect of other punishment likely to be imposed upon defendant in determining its punitive award.

This approach has a flaw, however. Defendants may be reluctant to put into evidence the number of similar suits against them out of fear that such information would prejudice the jury as to their liability. This is presumably why

## VIII. *Juror Misconduct.*

 Finally, defendant asserts that it is entitled to a new trial because of alleged misconduct on the part of the jurors in the instant case. Subsequent to the return of the verdict by the jury, defendant submitted affidavits from three of the jurors which indicated that members of the jury had possibly been exposed to extraneous information not properly introduced at trial.[23] In order to investigate defendant's allegations of juror misconduct, the Court conducted an exhaustive juror evidentiary hearing.[24] The evidentiary hearing revealed that some or all of the jurors were exposed to three types of extraneous information during the course of the trial and deliberations.

First, one of the jurors testified that on three or four occasions during the trial, she read articles in the St. Paul Pioneer Press Dispatch newspaper concerning the trial.

Searle chose in the instant case to not put into evidence the fact that there are approximately 500 Cu–7 related lawsuits pending against it, each of which could result in an award of punitive damages.

In this case, defendant must live with the consequences of its decision to present no evidence concerning defendant's potential exposure to punitive damages. However, the Court strongly believes that in order to protect future plaintiffs, courts and legislatures must fundamentally rethink the method by which punitive damages are awarded in mass tort lawsuits.

As the Court has already stated, it is constrained by the current law of remittitur and the Seventh Amendment to not reduce this punitive damage award on the basis of evidence which *defendant did not present.* The Court, however, believes that it would be wise to change existing law so as to allow courts to reduce punitive damage awards based on the number of potential future punitive awards pending against defendant, even though the defendant did not present to the jury evidence of these other pending lawsuits.

The Court is aware that this approach poses problems relating to a litigant's right to trial by jury. However, punitive damages do not really belong to the individual plaintiff, but are rather a windfall. Punitive damages are imposed for the *public* purposes of punishment and deterrence. *Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826 (Minn.1988). The Court believes that an individual litigant's Seventh Amendment interest in having his or her claim for punitive damages determined solely by a jury is perhaps weaker than in the case of compensatory damages.

The Court agrees with the Minnesota Supreme Court's view of punitive damages as expressed in *Hodder.* In *Hodder,* the court stated:

[P]unitive damages do not "belong" to the plaintiff in the same sense as compensatory damages. Punitive damages are to punish the defendant, not compensate the plaintiff who has already been compensated. Indeed, some argue that the public should have more of a claim to collect a punitive award than the plaintiff. In any event, it is because of the unique, public aspect of punitive damages that the court exercises a much closer supervision over these awards than is the case with compensatory awards.
426 N.W.2d at 837.

Therefore, the Court is of the opinion that it would be beneficial to alter the current law of remittitur to allow courts to reduce punitive damages awards because of the potentially devastating impact on future plaintiffs. A Court should have this power even though the court *cannot say that the punitive award, viewed in isolation, is shocking or unsupported by the evidence in the given case.* This remains for statutory or appellate resolution.

23. The three affiant jurors also independently sent a letter to the Court in which they voiced their displeasure with the deliberative process and the verdict. The Court is precluded from considering these statements by Fed.R.Evid. 606(b). *See Tanner v. U.S.,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). Rule 606(b) provides:

Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Accordingly, the Court has only inquired into those allegations of juror misconduct relating to extraneous information which the jurors may have received.

24. The evidentiary hearing was held *in camera* in order to encourage frank and honest answers from the individual jurors. The Court questioned each juror out of the presence of the other jurors. All counsel were present, and the Court allowed counsel to submit follow-up ques-

(hearing transcript at 79). The juror could not remember reading any specific article, but stated that the articles she read were summaries of the testimony heard by the jurors the previous day. She also stated that she mentioned to the other jurors that stories about the trial had been in the newspaper, but that they ignored her and would not discuss the matter. (hearing transcript at 80–82).

Second, the jury foreman testified that during the trial he was told by his brother-in-law, a doctor, that Searle had taken the Cu–7 off the market. The foreman testified that he mentioned this fact to the other jurors. (hearing transcript at 93–94).

Third, two jurors testified that they looked up certain definitions in dictionaries during deliberations. One juror testified that she looked up the definitions of the words "willful," "direct," and "intentional" in a Webster's dictionary. These words were all included and defined in the Court's instructions to the jury. The juror testified that she mentioned to the other jurors the definition that she had found for the word "direct" and that that definition pertained to directing people. (hearing transcript at 26–29).

Another juror testified that during deliberations, several jurors compiled a list of approximately ten medical terms which they wanted defined. That juror then took that list home, consulted a medical dictionary,[25] and copied the definitions for most of the words onto a sheet of paper.[26] (hearing transcript at 8).

The juror then brought this list of definitions into the jury room the next day, and put it on the table. She testified that some of the jurors looked at the list. Five of the eight jurors stated that they looked at the list. None could recall any of the specific definitions. (hearing transcript at 8–10).

The fact that a jury has had access to extraneous information will serve to impeach its verdict only where that information was prejudicial to the non-prevailing party. *Blake v. Cich,* 79 F.R.D. 398, 402–03 (D.Minn.1978); *see also* Fed.R.Evid. 606(b). The prejudicial effect of the extraneous information must be evaluated in the context of an "average" juror, or a "reasonable" juror, and not through an attempt to measure the actual effect on the jurors who were involved. *Lacy v. Gabriel,* 567 F.Supp. 467, 470 (D.Mass.1983) *aff'd* 732 F.2d 7 (1st Cir.1984); *Stephens v. South Atlantic Canners, Inc.,* 848 F.2d 484, 489 (4th Cir.1988).

Searle argues that where a jury has had access to extraneous information, the court should presume that the information was prejudicial. Some courts do apply such a presumption, even in civil cases. *Stephens,* 848 F.2d at 486; *In re Beverly Hills Fire Litigation,* 695 F.2d 207, 215 (6th Cir.1982).

The Eighth Circuit has applied a presumption of prejudice in criminal cases that involved extraneous factual information. *United States v. Cheyenne,* 855 F.2d 566, 567–68 (8th Cir.1988) (holding presumption of prejudice applies to extraneous factual information) (citing *Osborne v. United States,* 351 F.2d 111, 117 (8th Cir.1965)); *but cf. United States v. St. Clair,* 855 F.2d 518, 521 (8th Cir.1988) (discussing but not resolving a standard for prejudice). However, the question of whether a presumption of prejudice from extraneous information applies in a civil case is an open question in this circuit. *Neville Const. Co. v. Cook Paint & Varnish Co.,* 671 F.2d 1107, 1112 (8th Cir.1982).

In *Neville,* a criminal case, the court held that a rebuttable presumption of prejudice applies to juror exposure to extraneous materials or communications. 671 F.2d at 1112. The court also stated that it had not considered the question of a presumption

tions for each juror. *See United States v. Posner,* 644 F.Supp. 885, 886, 888 (S.D.Fla.1986).

**25.** The juror consulted a *"Taber's Cyclopedic Medical Dictionary,* 14th ed. (1981)." The juror produced this dictionary at the evidentiary hearing for the Court to examine.

**26.** None of the jurors could recall all of the words on the list. The words which the jurors could recall seeing on the list were "menses," "menarche," "salpingoplasty," "endometritis," "endometriosis," and "canalization." One of those words, "salpingoplasty," was not defined in the dictionary the juror consulted.

of prejudice in civil cases. *Id.* The court then noted that the Ninth Circuit has held that exposure of jurors to extraneous evidence in a civil case calls for a new trial only if the documents are prejudicial to the unsuccessful party. *Id.* (citing *Benna v. Reeder*, 578 F.2d 269, 271–72 (9th Cir.1978).

■ This Court will not apply a presumption of prejudice to the extraneous evidence involved in this case. It will order a new trial only if defendant was prejudiced by the jury's exposure to extraneous information, evaluated in the context of an "average" or "reasonable" juror. *Blake*, 79 F.R.D. at 403; *Lacy*, 567 F.Supp. at 470.

■ The fact that one of the jurors read several newspaper articles about the trial during its course cannot be found to be prejudicial to defendant. The juror did not discuss these articles with the other jurors. Searle has not shown any information in any of the St. Paul Pioneer Press Dispatch articles that would warrant upsetting this verdict.

■ The Court further concludes that the fact that the jury foreman stated to the other jurors that Searle took the Cu–7 off the market is not sufficiently prejudicial to defendant to require a new trial. It is true that the Court previously ruled that evidence of discontinuance of the Cu–7 was inadmissible under Fed.R.Evid. 403 because the risk of prejudice from the evidence outweighed its probative value. However, this ruling was supported more by the evidence's complete lack of probative value than to prejudicial effect.

■ The Court finds that the jury's understanding of the law was not confused by the fact that one juror looked up the words "willful," "direct," and "intentional" in a dictionary. The facts in the instant case are analogous to those in *U.S. v. Cheyenne*, 855 F.2d 566 (8th Cir.1988). In *Cheyenne*, the jury used a pocket dictionary during its deliberations to define the terms "wanton" and "callous." 855 F.2d at 567. The court held that where the jury simply supplements the court's instructions of law with dictionary definitions, it is within the discretion of the trial court to determine whether this conduct distorted the jury's understanding of the law to the prejudice of defendant. *Id.* at 568. The trial court concluded that the jury's use of the dictionary did not prejudice defendant. *Id.* at 567.

The *Cheyenne* court held that the trial court did not abuse its discretion in holding that the jury's use of the dictionary did not prejudice defendant. *Id.* at 568. The court pointed out that the trial court conducted an evidentiary hearing to determine the effect the dictionary had on the jury's deliberations. *Id.* The court also noted that the juror's testimony indicated that the dictionary was used sparingly, and that some of the jurors were unaware of its use. *Id.*

Here also, the Court conducted an extensive evidentiary hearing. The hearing revealed that during deliberations one juror had consulted a dictionary for the definitions of three words: "willful," "direct," and "intentional." The juror then orally reported to the other jurors that the definition of "direct" pertained to directing people. There was no further discussion among the jurors of these definitions. Under these circumstances, the Court finds that one juror's use of a dictionary to define three words in the jury instructions did not distort the jury's understanding of the law to the prejudice of defendant.

■ Finally, the Court must consider whether the defendant was prejudiced by the jury's exposure to certain definitions from a medical dictionary. The Court views this matter more seriously, because in this instance the jurors were exposed to extraneous factual information, and not simply additional legal information. The Court believes that in deciding this issue, it must look to the factors considered in *Harold v. Corwin*, 846 F.2d 1148 (8th Cir. 1988).

In *Harold*, the jury had inquired of the court during its deliberations as to the meaning of the term "poorly differentiated tumor." The phrase had not been either read or explained to the jury at trial. The district judge attempted to define the phrase on his own. Over the objection of

both parties, he read the jury a definition of the word "differentiated" from a medical dictionary.[27]

The *Harold* court held that under the circumstances, the non-prevailing party suffered substantial prejudice due to the trial judge's actions. 846 F.2d at 1151. The court stated that the district court's actions suffered from three vices: the definition was read from the dictionary, was read to the jury by the court over counsel's objections without any supplemental instructions or directions, and the definition given neither fairly nor accurately described the phrase "poorly differentiated tumor" in the medical context in which the term was used. *Id.*

The Court believes that the facts in the instant case are different from those in *Harold*, and that defendant has not been prejudiced by the jurors' use of the medical definitions in this case.[28] First, in *Harold* the term at issue had not been read or referred to at trial. In this case, each word which the jurors recalled defining, except "canalization," was referred to in its proper context at trial by experts. (transcript at 545, 2613, 753, 380–31). Several of the words were defined as well.

Further, the definitions in the instant case were not read to the jury by the judge. In *Harold*, the judge essentially admitted the dictionary definition into evidence, and added the court's imprimatur of veracity by reading it to the jury. In the instant case, the Court lent no sanction to the definitions culled from a juror's own medical dictionary.

Most importantly, in *Harold* the court found that the definition used by the district judge was misleading. The Court has reviewed the definitions used by the jurors in this case, and does not find that they are misleading in light of the testimony heard at trial. The words that the jurors recall seeking definitions for, and which actually

had definitions listed in the *Taber's Cyclopedic Medical Dictionary*, are "menses," "menarche," "canalization," "endometritis," and "endometriosis."

*Taber's* defines "menses" as:

> Monthly flow of bloody fluid from the uterine mucous membrane.

At trial, Dr. Sweet used the term "menses" to mean "menstrual flow." (transcript at 545). Dr. Darney gave a more extensive discussion of the term. He stated:

> There is another time when cervical mucus changes, and that's when menses occurs, when blood runs out of the uterus. If the egg doesn't get fertilized, then the hormone that that second little cyst I described was making, that hormone that was going to preserve the pregnancy, its level falls steeply.... In response to that, the lining of the uterus comes off and builds up again and the cycle goes on if pregnancy doesn't occur. And when the lining of the uterus sheds off....

(transcript at 2613).

The Court finds that the *Taber's* definition of "menses" is not confusing or misleading in light of the expert testimony offered at trial.

*Taber's* defines "menarche" as:

> Onset of menses. Occurs normally between the 10th and 17th year. The average age of menarche is 12.8.

At trial, Dr. Sweet referred to menarche as "what age she started menstruating." (transcript at 753). The Court concludes that the *Taber's* definition fairly and accurately described the term "menarche" in light of the expert testimony at trial.

*Taber's* defines "canalization" as "[f]ormation of channels in tissue." This term was not used at trial. The Court does not believe that the jury's use of this definition

---

**27.** The *Harold* opinion states:

> [The district judge] told the jury that *"poorly differentiated tumor"* could not be found as a *phrase* in the medical dictionary, and that all he could find was *"differentiated,"* and that it was *"using elastic"* to read the definition that was about to be read.

846 F.2d at 1151 (emphasis in original).

**28.** The court in *Harold* stated: "we do not believe that the use of a dictionary is prejudicial *per se....*" 846 F.2d at 115 (citations omitted).

could have resulted in confusion or prejudice in this case.

*Taber's* defines "endometriosis" as:

Ectopic endometrium located in various sites throughout the pelvis or in the abdominal wall.

At trial, Dr. Soderberg testified that:

Endometriosis is an interesting gynecologic condition, in which the glands which are in the lining or endometrium of the uterus and are normally shed during a normal menstrual period somehow, and usually by flowing back up through the ends of the tubes, find themselves in the pelvis, within the abdominal and pelvic cavity. They then implant and start to grow.

(transcript at 2106).

Dr. Sweet testified that:

Endometriosis is a disease and when the tissue that lines the uterus, that endometrium, the inside lining of the uterus, when that tissue occurs in other parts of the body instead of inside the uterus— it can be on the ovary, it can be on the bladder, it can be on the bowel. And basically what happens is whenever it's time for menstrual period, that tissue bleeds as well.

(transcript at 380). The Court is of the opinion that the *Taber's* definition of "endometriosis" viewed by some of the jurors was not meaningfully different from the testimony offered at trial, and did not prejudice defendant's case.

*Taber's* defines endometritis as:

Inflammation of the endometrium. ETIOL: Produced by bacterial invasion. May be acute, subacute or chronic, the acute cases most commonly resulting from infection by staphylococci, colon bacilli, or gonococci; trauma, septic abortion. The subacute and chronic types are the result of repeated acute attacks. Occasionally the chronic type may be due to infection with the tubercle bacillus. There are many other conditions which are labelled as endometritis but are of either vascular or endocrine origin. Some of these conditions are senile endometritis, hyperplastic endometritis, and hypertrophic endometritis.

SYM: In acute cases the symptoms are usually low back and low abdominal pain, dysmenorrhea, menorrhagia, sterility, and constipation. In chronic endometritis, there is scant serosanguineous vaginal discharge. A positive diagnosis cannot be made without a curettage and a histological study of the recovered material.

There was extensive testimony at trial as to the definition and nature of endometritis. The Court will review what it considers the most germane testimony in comparison with the *Taber's* definition.

Dr. Sweet testified that "[e]ndometritis is an infection of the lining of the uterus...." (transcript at 381). Dr. Sweet further testified that:

A tender adnexa is very, very important, because we use that to differentiate between somebody who has an infection that's only limited to the uterus, which would be called an endometritis, and somebody in whom the infection now involves the fallopian tubes as well. So that's a key differentiation between endometritis and pelvic inflammatory disease.

The other thing that speaks for the fallopian tube being involved as well is the nausea and the poor appetite, because that suggests she had an ileus, which is a paralysis of the bowel, which happens when there is an infection in the peritoneal cavity. With an endometritis you don't often get that. But with salpingitis, it can commonly occur, or with an infection of the tube, which is what salpingitis is.

(transcript at 389–90).

The Court notes that *Taber's* is a cyclopedic medical dictionary, and contains more extensive discussions than would a normal dictionary. The Court also realizes that the term "endometritis" was the subject of disagreement at trial. The Court concludes, within the limits of its medical knowledge, that the *Taber's* definition of "endometritis" is not misleading or so prejudicial to defendant's case that a new trial is warranted.

The Court points out that in considering the potential prejudice from the jurors' use of the medical dictionary, it is significant that the jury listened to three and one half months of expert testimony. Further, the Court notes that there was practically no discussion of the *Taber's* definitions among the five jurors that read the list.[29] The jurors also testified that they had no knowledge of what became of the list of definitions after the first day it was brought into the jury room.[30] (hearing transcript at 32, 64–65, 73). None of the jurors indicated that the list was further consulted after the day it was introduced.

The Court in no way condones the improper conduct of the jurors in this case. However, after reviewing the record and hearing the testimony of the individual jurors, the Court concludes that the defendant was not denied a fair trial.

### ORDER

Accordingly, based on the foregoing discussion, IT IS HEREBY ORDERED that:

1. Defendant's motion for JNOV on plaintiff's intentional misrepresentation claim is denied.

2. Defendant's motions for JNOV or a new trial on plaintiff's claim under Minn. Stat. § 325F.67 (False Statement in Advertising) is denied.

3. Defendant's motion for JNOV on plaintiff's failure to test claim is granted. Defendant's motion in the alternative for a new trial is conditionally denied.

4. Defendant's motion for a new trial based on the Court's refusal to allow defendant to challenge the credibility of Dr. Fives–Taylor is denied.

5. Defendant's motion for a new trial on all grounds relating to the actions of United States Magistrate Janice Symchych is denied.

6. Defendant's motion for a new trial on all grounds relating to the jury's award of punitive damages is denied. Defendant's motion for remittitur is also denied.

7. Defendant's motion for a new trial on the ground of juror misconduct is denied.

---

**29.** One juror testified that two other jurors discussed the list, and that the nature of the conversation was "[j]ust basically that the words were what we thought they were." The juror also recalled that "[a juror] said out loud what the difference between endometritis and endometriosis was." (hearing transcript at 33).

**30.** One juror testified that she assumed that the list was still lying on the table after the jury returned its verdict, but she could not recall ever seeing it again after it was first placed upon the table. (hearing transcript at 22).